UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

UNAKA COMPANY,                      )
INCORPORATED, <u>ET AL.</u>         )
                                    )
v.                                  )
                                    )
GORDON NEWMAN                       )
and JERALD JAYNES                   )
                                    )
and                                 )          NO. 2:99-CV-267
                                    )
GORDON NEWMAN                       )
and JERALD JAYNES                   )
                                    )
v.                                  )
                                    )
UNAKA COMPANY,                      )
INCORPORATED, <u>ET AL.</u>         )


## <u>MEMORANDUM  OPINION</u>

The original plaintiffs, Colin M. Henderson ("Henderson"), as trustee of

the Unaka Company, Inc. Employees' Profit Sharing Plan and Trust (the "Plan"), Gary

W. Landes ("Landes"), as a Plan participant, and in his capacity as a former member

of the Plan's Administrative Committee, and Lonnie F. Thompson ("Thompson"), as a

Plan participant and in his capacity as a former member of the Plan's Administrative

Committee, brought this complaint against Gordon H. Newman ("Newman") and

Jerald K. Jaynes ("Jaynes"), defendants, alleging a cause of action for breach of fiduciary duty under the Employee Retirement Income Security Act ("ERISA"), as amended, 29 *U.S.C.* § 1001 *et seq.* Unaka Company, Inc. ("Unaka") was substituted as a party plaintiff instead of Henderson pursuant to an assignment of the Plan's claims in this case to Unaka. Newman and Jaynes counterclaimed seeking contribution and/or indemnity from Landes and Thompson and alleging breaches of fiduciary duty by Unaka, Henderson and Strategic Investment Counsel Company ("STRINCO") (the Plan's financial adviser) for allegedly entering into a prohibited transaction for the sale of Plan stock to Unaka and entering into an assignment and loan agreement with Unaka in violation of ERISA. This Court has exclusive jurisdiction over this matter pursuant to 29 *U.S.C.* § 1132(c)(1) and 28 *U.S.C.* § 1331. Venue is proper in this district pursuant to 29 *U.S.C.* § 1132(c)(2).

This matter came on for trial before the Court without intervention of a jury from November 3, 2004 through December 8, 2004. Having heard the evidence presented at trial and having considered the proposed findings of fact and conclusions of law filed by the respective parties and having considered the applicable law, the Court hereby makes the following findings of fact and conclusions of law.

# FINDINGS OF FACT

The Austin family has been in the tobacco business in Greene County, Tennessee since before the turn of the twentieth century. The tobacco business, known at the time as Austin Tobacco Company, was sold in 1989 or 1990. Years prior to that, Robert C. Austin, Sr. ("Austin, Sr.") had become concerned about the future of the tobacco business and had formed Unaka, a closely held Tennessee corporation, as a holding company to be used to diversify the family business into other areas. Unaka was then used for the non-tobacco holdings of the family.

Among Unaka's current holdings are two principal divisions. Meco, an acronym for Metals Engineering Company, manufactures barbeque grills and consumer folding furniture. SoPakCo (Southern Packaging Company) produces shelf staple foods and its principal customer is the United States military. Both divisions have suffered negatively from market forces over the last decades – Meco as a result of foreign competition and SoPakCo because of the uncertainty of military contracts for its Meals Ready to Eat ("MREs").

The Plan was established by Unaka on February 1, 1967 to provide its participants with income upon their retirement. All Unaka employees and employees of its affiliated employers are eligible to participate in the Plan after one year of service. Participant accounts are

established and maintained by the administrator for each participant with respect to his or her total interest in the Plan and trust. Benefits are payable to participants upon their normal retirement, death, disability or termination. Section 7.11 of the Plan document authorizes the Plan to acquire and hold "qualifying employer securities", that is, Unaka stock, so long as, immediately after the acquisition, these securities amount to no more than 25% of the fair market value of all the assets of the trust fund.

In 1987, a difference of opinion developed among upper level Unaka management about whether or not to sell Meco. As a result, a group known as "GO-EIGHT" made a tender offer for the stock of Unaka. GO-EIGHT was a group of investors composed of members of the Austin family, Jaynes and others. Austin, Sr., using a small family investment company, Rolich Corporation ("Rolich"), another closely held Tennessee corporation, as a vehicle, made a counter offer. Rolich was ultimately the successful bidder and acquired a controlling interest in Unaka. At the time of the 1987 buy-out of Unaka, Rolich was a corporation owned by Austin, Sr.'s wife, Mary T. Austin, and their three children, Robert C. Austin, Jr. ("Austin, Jr."), Elizabeth T. Austin ("Lisa") and Christy N. Austin ("Christy").

On December 27, 1987, in connection with Austin, Sr.'s obtaining control of Unaka,[1] the Plan acquired 2,500 shares of Unaka common stock at a price of $220.00 per share. On December 28, 1987, the Plan purchased an additional 6,500 shares of Unaka common stock, also at a price of $220.00 per share. On October 1, 1989, the Plan purchased an additional 5,000 shares of Unaka common stock at $250.00 per share, bringing the total shares of Unaka common stock owned by the Plan to 14,000. These additional shares were acquired in 1989 because Fleet National Bank, the bank which had provided financing to Rolich for the initial purchase of the Unaka shares, required a cash infusion at Unaka because of losses at Meco. These Unaka shares were an illiquid, non-income producing asset of the Plan for which there was no ready market.

Immediately after the December 1987 and October 1989 acquisitions of Unaka stock, the fair market value of all of the Unaka common stock held by the Plan did not exceed 25% of the fair market value of all of the Plan's assets at the time of acquisition. By October, 1996, however, the Plan's Unaka common stock made up approximately 36% of the Plan's assets. The Plan's holdings of Unaka common stock represented approximately 26% of the outstanding shares of Unaka.

---

[1] It was not uncommon for Robert C. Austin, Sr. to use Plan funds for business purposes. It was also apparently not uncommon for Plan funds to be loaned to related Austin entities or Austin family members.

Case 2:99-cv-00267   Document 341   Filed 04/26/05   Page 5 of 87   PageID #: 682

As part of the 1987 buy-out, Unaka assumed a portion of the debt incurred by Rolich, thus making Rolich a debtor of Unaka. The inter-company debt was formalized in 1992 when Unaka's board of directors approved a credit agreement between Rolich and Unaka. Rolich's primary asset was the Unaka stock it acquired in the 1987 leveraged buy-out and Rolich had no income. In order to provide an income stream from which the interest on the inter-company debt between Rolich and Unaka could be paid, a management services plan was approved in November, 1993 and implemented in January, 1994 under which certain executive and administrative personnel previously employed by Unaka were transferred to the employ of Rolich. Rolich then charged Unaka a fee for management services provided to Unaka and Unaka used the management fee, which slightly exceeded $400,000.00 annually, to service the interest on the Unaka debt. Rolich's debt to Unaka totaled $7,900,405.00 on June 30, 1996.

Newman, who began working for Unaka in 1968, advanced to the position of Unaka's chief financial officer and a member of the Unaka Board of Directors. Newman also held various other positions in Unaka and in various other Unaka subsidiaries. Jaynes, who began working for the Austin Company in 1962 as an accountant, was Unaka's president and a member of the Board of Directors of

Unaka's majority stock holder, Rolich.[2]  Landes was president of Meco, a subsidiary

of Unaka and Thompson was president of SoPakCo, another Unaka subsidiary.

Mary T. Austin died in August, 1989, and, by her last will and testament,

willed her entire estate to her husband, Austin, Sr. *In re Estate of Austin*, 920 S.W. 2d

209 (Tenn. 1996).  Austin, Sr. opened an estate for Mary T. Austin for the purpose of

filing a disclaimer as to the Rolich stock and certain other assets contained in the

estate.  The Estate of Mary T. Austin ("Estate") owned approximately 31% of the

outstanding Rolich stock.  As the result of the disclaimer by Austin, Sr., the Rolich

shares owned by Mary T. Austin then passed, in equal shares, to her three children.

After the death of Mary T. Austin, no shareholder owned a controlling interest in

Rolich.

Austin, Sr. died in August, 1990.  Prior to his death, he had been involved

in discussions with Unaka's corporate attorney about how to structure management of

the companies after his death.   The only one of the Austin children who had shown

any interest in being involved in the company at that time was Lisa.  Neither Austin,

Jr. nor Christy had shown any interest in running the company.  Just prior to his death,

Austin, Sr. had been involved in discussions about how to structure Lisa's

involvement in the company without giving her absolute control over the interest of

---

[2]   Both Newman and Jaynes had a close relationship with Robert C. Austin, Sr.  Jaynes described his
relationship with Robert C. Austin, Sr. as "like a son."

her siblings. These discussions were on-going at the time of Robert C. Austin, Sr.'s death and he died intestate. He did leave a partially handwritten document which did not, however, address any of the control issues related to Unaka.

Almost immediately following the death of Austin, Sr., the relationships among the Austin siblings deteriorated, resulting in an acrimonious, no-holds-barred, somewhat unseemly and very public struggle over control of the estates and the resulting control over Unaka and Rolich. Initially, Austin, Jr. was aligned with his sister, Christy, and her husband, William Fagan, ("Fagan") against Lisa and her husband, Ben Gray. Numerous lawsuits were brought by and against Austin family members, Rolich, Unaka, directors of these companies and other related persons.[3]

One of the Austin siblings, Lisa, had transferred 1,580 shares of Unaka common stock and 230 shares of Rolich common stock to Richard Roberts ("Roberts") in exchange for non-recourse promissory notes. Under the terms of the agreement between Lisa and Roberts, no money was to be paid to Lisa and no interest was to accrue on the promissory notes until Roberts was able to sell the Unaka and Rolich stock or meet one of the other conditions specified in the agreement. Among the lawsuits filed was a shareholder derivative action by Roberts in the Greene County Chancery Court on September 22, 1995. Roberts sued Rolich, Unaka and

---

[3] The dissension among the Austin siblings was so great that it later led to one court appointed administrator of the Mary T. Estate asking to be relieved of his duties due to the "stress and acrimony."

their respective officers and directors challenging, among other things, the management services plan, which he characterized as an improper plan used to convey Unaka's assets to Rolich in order to permit Rolich to pay its debt to Unaka. Roberts' counsel had also raised concerns about the inter-company debt, the value placed on the Unaka stock and other issues. Because the Plan had an interest in the questions raised by Roberts because of its status as a minority shareholder of Unaka, the administrative committee of the Plan retained Gordon Nichols[4] ("Nichols") of Boult, Cummings, Conners & Berry as legal counsel to assist the administrative committee in these matters. Also, on July 31, 1995, Lisa Austin and Susan Austin filed an ERISA suit in this Court against Unaka, Austin, Jr.,[5] Gordon Chalmers (a Unaka director and member of the administrative committee at that time), defendant Newman, the Plan and others.[6] This complaint alleged that the administrative committee had breached its fiduciary duties by failing to determine prudently the value of the Plan's Unaka stock while allowing continued distributions to retirees based on a Unaka per share value of $440.00. Since the acquisition of the Unaka Common stock by the Plan, it had been

---

[4] Nichols was originally a defendant in this action; however, he settled with the plaintiffs prior to trial. Apparently the settlement agreement with Nichols contained an unusual provision that Nichols could not thereafter cooperate with Newman and Jaynes in the defense of this case.

[5] Austin, Jr. served as a member of the Plan Administrative Committee from mid-1995 until mid-1996.

[6] This suit was ultimately dismissed resulting in the assessment of fees, costs and sanctions against Lisa and Susan Austin.

valued at various amounts, but most recently at $440.00 per share. Efforts were ongoing throughout 1996 to resolve all of the pending litigation.

The companies were suffering dramatically under the burden of this "massive" litigation and Unaka's lenders were becoming nervous and pressuring for a resolution of the disputes. In February, 1996, a special committee of Unaka's Board of Directors issued a report and made various recommendations concerning the pending litigation. The special committee report acknowledged concern about the inter-company debt and recommended that the Unaka board consider calling the Rolich debt, secured by Rolich and Unaka stock, if an acceptable repayment schedule was not provided. Over the next several months, numerous proposals were put forth by various parties, including Austin, Jr., to recapitalize the companies and eliminate the inter-company debt, for downstream and/or upstream mergers, for the formation of an ESOP (Employee Stock Ownership Plan) and numerous efforts were made at a "global settlement" of the various claims made in the litigation and the disputes among the Austin siblings. At the heart of many of these discussions were efforts by one or more of the Austin siblings, either individually or jointly, to gain control of Rolich and Unaka. Rolich Corporation owned a majority interest in Unaka; therefore, control of Rolich effectively brought control of Unaka.

The Estate's 382 shares made the Estate the largest single shareholder of Rolich. Since under Tennessee law that stock would pass equally to the three Austin

siblings, it was not surprising that a dispute arose among the siblings over whether the stock should be distributed in kind among the three children or whether the stock should be sold and the proceeds distributed to the children. In April, 1996 the Tennessee Supreme Court held that the Estate was required to sell the stock and distribute the proceeds to the children. The Court's decision was significant because the block of Rolich shares owned by the Estate was sufficiently large that its acquisition by either Austin, Jr. or Christy (Lisa had transferred her shares in Rolich to Roberts), when combined with the block of shares Austin, Jr. or Christy then owned, would result in one or the other having a majority of Rolich's outstanding shares, thus giving them control over both Rolich and Unaka. In August, 1996, Austin, Jr. offered to purchase Christy's stock in both Rolich and Unaka for Six Million Three Hundred Fifty Thousand ($6,350,000.00) Dollars. These negotiations continued throughout the fall of 1996 but ended with a "blow-up" on October 31, 1996. Thereafter, the alliance between Austin, Jr. and Christy did not exist.

The Plan is administered by one or more "administrators" appointed by Unaka and who are charged with the "general administration" of the pension plan for the exclusive benefit of the participants and their beneficiaries, subject to the specific terms of the Plan. Until late October of 1997, the administrators appointed by Unaka were referred to collectively as the Plan's Administrative Committee ("PAC"). From mid 1996 until at least April 27, 1997, the PAC was composed of defendants Newman

and Jaynes, Landes and Thompson.[7]  Newman was chairman of the PAC.  Newman, Jaynes, Landes and Thompson were, therefore, fiduciaries with respect to the Plan within the meaning of ERISA § 3(21)(A)(i), 29 *U.S.C.* § 2001(21)(A)(i).  Newman had been appointed Chairman of the PAC around 1990 and was generally responsible for the day-to-day management of the Plan.  Jaynes, Unaka's president,  CEO and a member of the Board of Directors of Rolich, generally chaired Rolich board meetings.

Against this backdrop, the events which are at issue in this litigation began to occur.  On or about October 15, 1996, Austin, Jr. formed Nothung, Inc. ("Nothung"), a Tennessee corporation.  Nothung had only minimal assets of $1,000.00 and reported no income in 1996.  Austin, Jr. was the sole shareholder of Nothung. On October 16, 1996, Austin, Jr. made a proposal by letter  to the administrative committee on behalf of Nothung to purchase the Plan's Unaka stock at $413.00 per share.[8]  At an October 21, 1996 special meeting of the administrative committee, Nichols, the committee attorney, advised the committee that selling the Plan's stock to a company owned by Austin, Jr. would violate ERISA's prohibited transaction rules unless the sale price was at least equal to the stock's fair market value on the sale

---

[7]  Unaka had appointed defendant Newman to serve on the Administrative Committee in 1987.  Jaynes, Landes and Thompson had been appointed in the summer of 1996, after all members of the Administrative Committee, except Newman, had resigned in May, 1995.  Between May, 1995 and the appointment of Jaynes, Landes and Thompson, Austin, Jr. and Gordon Chalmers were members of the PAC.

[8]  Austin, Jr. had been making offers to the Plan for the purchase of its Unaka stock as far back as 1991.

date.[9]  The administrative committee believed that the proposed $413.00 per share purchase price was less than the fair market value of the Plan's Unaka stock and rejected Austin, Jr.'s offer.[10]

After further negotiations,  the administrative committee approved a letter of intent ("the agreement") between the Plan and Nothung which was executed on October  29, 1996.  The letter of intent sets forth the principal terms and conditions upon which Nothung or its assigns . . .  "would be willing to proceed toward the objective of concluding a purchase of the 14,000 shares of common stock  . . ." of Unaka owned by the Plan at a price of no less than $413.00 per share or $5,782,000.00.  The agreement further provided that the purchase price would be no less than $454.00 per share or $6,356,000.00 in the event Unaka's subsidiary SoPakCo was awarded a government contract to provide MREs to the government.[11]

A Ten Thousand ($10,000.00) Dollar deposit was to be paid to Unaka's attorney, Kenneth Clark Hood, as escrowee, simultaneous with the execution of the letter of intent.  The deposit, plus accrued interest, was to be applied to the purchase

---

[9]  Nichols' advice, according to Jaynes, "had scared us to death in the beginning about trading with an insider." Given the potential for personal liability, it is reasonable that the Committee would proceed with caution in its dealings with Austin, Jr., especially given the litigious nature of the Austin siblings.

[10]  The minutes of the same October 21, 1991, PAC meeting  reflect that the Committee was concerned with Austin, Jr.'s "truthfulness in his . . .dealings with them."  Notwithstanding these concerns, the Committee entered into the October 29 letter of intent with Austin, Jr.

[11]  SoPakCo was later awarded the contract referenced in the letter of intent; therefore, the price contemplated by the letter of intent was "no less than $454.00 per share."

price at closing or refunded to Nothung upon failure of the Plan to execute and

proceed in accordance with the terms of a definitive agreement or paid to the Plan

upon default of Nothung after the execution of a definitive agreement.

The conditions precedent to closing included:

(1)  Negotiation and execution of a definitive agreement for the purchase and
sale of the stock;

(2)  Nothung's ability to obtain financing "upon such terms as are acceptable to
it";

(3)  receipt by the administrative committee of an independent appraisal and
opinion acceptable to the administrative committee that the purchase price specified in
the agreement is no less than the stock's fair market value on the date of closing; and

(4)  receipt by the administrative committee of such assurances as it deemed
appropriate from legal counsel and/or other advisers that the sale would not violate the
committee's fiduciary duties.

Closing was to take place no later than 90 days following the execution of

the agreement or by January 27, 1997.  There was no provision in the agreement that

Nothung  provide evidence of financing to the Plan before closing.  Although

plaintiffs in this case argue otherwise, there was also no requirement that the Plan

provide  its appraisal to Nothung  prior to closing.[12]  Likewise, contrary to plaintiffs'

_____

[12]  Plaintiffs make much of what they perceive to be the Plan's refusal to provide an appraisal to Austin,
Jr. prior to the time for closing of the stock sale/purchase.  The letter of intent, however, did not require this.  It
simply provided that Nothung could rely on the appraisal.  This confusion could easily have been avoided if
Nothung had simply required in the letter of intent that an appraisal be provided by the Plan a specified number
of days before closing.  Alternatively, Austin, Jr. could have acquired his own appraisal to provide to a
prospective lender if he had to have one prior to closing.  What is bothersome to the Court about all of this is that
Konvalinka, Austin, Jr.'s attorney,  insisted that Nothung could not go forward with a closing until it had both the
appraisal and stock purchase agreement to provide to a  lender.  Not only is such a position inconsistent with the

position, the agreement placed the burden of preparing the "documents necessary to carry out the terms" of the agreement on Nothung, the purchaser.[13]  The parties were required to "proceed in good faith" and if <u>all</u> conditions precedent had not been met by the date of closing, all obligations of the parties under the agreement would cease in their entirety.   The agreement was signed by Austin, Jr. as president of Nothung and by Newman as chairman of the Plan.

At the time of the signing of the agreement, all of the PAC  members agreed that it was in the best interest of the Plan to sell the Plan's Unaka stock. Nichols, the Plan's attorney, agreed that it was in the best interest of the Plan to sell the stock because of the illiquid nature of the Plan's assets.  Nichols, however, advised the PAC members that they were under no duty to sell the stock and should, in fact, pursue all other available alternatives to the sale contemplated by the letter of intent.

On December 2, 1996, John Konvalinka ("Konvalinka"), Austin, Jr.'s attorney, forwarded to Nichols, the Plan's attorney, a draft "Escrow Agreement" and

---

letter of intent, such  position seems completely contradictory to Austin, Jr.'s insistence that the Rogers money was available to close the purchase.  As Nichols pointed out in his January 13, 1997, letter, signing of the stock purchase agreement simultaneously with the closing should not have been a problem for Austin, Jr. since Austin, Jr. had indicated that he already had financing.  The Court also notes that the draft stock purchase agreement Konvalinka sent to Nichols on December 12 did not contain any requirement that the Plan provide an appraisal prior to closing.

[13]   The Court finds the actions of Austin, Jr.'s attorney in this regard somewhat baffling.  Despite the language of paragraph 6.a of the letter of intent, which clearly acknowledges that it is the obligation of the purchaser (Nothung) "to proceed with further development of documents necessary to carry" out the agreement, Konvalinka sent a letter to the Plan attorney on December 2, asking, in essence, "who is to draft the agreement?" He also testified that he believed it customary for the seller to prepare the first draft of the purchase agreement.

apparently deposited the required $10,000.00 escrow payment with Kenneth Clark Hood at the same time.[14]  On December 12, 1996, 44 days after the agreement was signed, an unsigned draft purchase agreement was forwarded by Konvalinka to Nichols.[15]

During the two months after the signing of the letter of intent, both Austin, Jr. and his sister, Christy, were actively involved in efforts to achieve control over Rolich, and thus Unaka.  Austin, Jr. made several attempts to purchase additional Rolich stock and Konvalinka offered on November 8, 1996 on behalf of Austin, Jr. to provide an $11,000,000.00 capital infusion to Rolich in exchange for 2,200 newly issued Rolich shares at $5,000.00 per share.  Austin, Jr. offered to provide $2.5 million of that capital infusion to be used by Rolich to fund a proposed settlement with Lisa and Roberts and to provide the remaining $8.5 million on or after February 1, 1997. The Rolich board of directors declined to consider Austin, Jr.'s offer on December 11, 1996.

During this same time, the administrative committee was also actively

---

[14]   The Court notes Plaintiffs' argument  that the eventual return of this escrow payment to Austin, Jr. by the Plan somehow reflects that it was the fault of the Plan that the stock sale contemplated by the letter of intent was never completed.  The letter of intent, however, provided that the deposit would be retained by the Plan in only one circumstance, *i.e.* default by Austin, Jr. <u>after</u> the execution of a definitive stock purchase agreement. This never occurred because a definitive agreement was never executed.  The letter of intent also provides that "time is of the essence" and neither the deposit of the escrow payment nor the preparation of a draft stock purchase agreement by Austin, Jr. appear to have been timely.

[15]   Nichols had expected Nothung to circulate a draft purchase agreement immediately after the execution of the letter of intent.

involved in efforts to find an alternative to the sale of the Plan's stock to Austin, Jr. It is quite clear from all the testimony that Newman and Jaynes preferred that Christy win the control battle with Austin, Jr. Not only was that their preference, they actively assisted Christy in her efforts to win control.[16] They initially instructed Nichols, on behalf of the committee, to focus on a deal with Christy, a merger of Rolich and Unaka and converting the existing Plan to an ESOP, to the exclusion of the proposed sale of the Plan's stock to Austin, Jr.[17] Christy was seen by Newman and Jaynes as more "employee friendly" and more trustworthy than Austin, Jr.[18] They also believed Christy's management style to be less aggressive and less combative than that of Austin, Jr.[19] On November 20, 1996, the Plan, as a shareholder, entered into an agreement with Christy and her husband to pursue, among other things, a merger of Rolich and Unaka and a conversion of the Plan to an ESOP.[20] The Plan's attorney,

---

[16] Jaynes also testified that he was concerned about what to do because of the long term consequences to the companies under Austin, Jr.'s management. This clearly illustrates the practical problem company employees who also serve as fiduciaries for the company pension plan have with divided loyalties. Fiduciaries owe complete loyalty to the beneficiaries of the plan and their best interest should be the only concern for the fiduciary. Who ultimately won the control battle for Rolich and Unaka was of little consequence to the Plan participants and beneficiaries if the Plan stock was sold for fair market value.

[17] Newman also testified that he directed Nichols to begin working on the Mercer Capital evaluation immediately after the Nothung agreement was signed. Contrary instructions to Nichols may explain the apparent lack of effort on the part of the Plan to obtain an evaluation before January, 1997.

[18] It was also apparent that none of the Austin siblings trusted the other.

[19] As Landes stated it, Austin, Jr. had a tendency to be vindictive if he didn't get his way.

[20] According to Newman and Jaynes, the benefit to the Plan of the agreement with Christy, had it been completed, would have been to make the Plan a one-third owner of Rolich and part of a control block of stock

Nichols, was involved in negotiating and drafting the November 20 agreement on behalf of the Plan. By this time, a clear split had emerged between Austin, Jr. and his sister, Christy, over their competing efforts to gain control over Rolich and Unaka. It also was clear by this time that efforts to negotiate a resolution of the differences between Austin, Jr. and Christy were futile.

The November 20 agreement, between the Plan and Christy and her husband , contemplated a shareholder agreement which would have resulted in a shared control arrangement with the Plan. A proposed draft shareholder's agreement was discussed at the administrative committee meeting on November 26, 1996 and a motion was made by Thompson, seconded by Landes, and passed unanimously, to authorize Newman to sign the shareholders agreement "as it may be revised on such terms as he and Jerald Jaynes shall agree." Newman subsequently executed a revised version of the shareholder agreement on December 27, 1996. If the merger of Rolich and Unaka and a conversion of the Plan to an ESOP had occurred, the Plan's equity share in the surviving company would have increased to approximately 36%, the value of the Plan's Unaka stock would likely have increased and the conversion to an ESOP

---

which would have substantially increased the value of the Plan's Unaka stock and assured the Plan of a seat on the Rolich Board of Directors. This was a high stakes gamble, however, which Jaynes acknowledged was unlikely to succeed, in that the stock of Unaka would become virtually worthless if Christy were not successful as a bidder at the December 27, 1996 auction of the Estate's Rolich stock. In addition, given the history of rapidly changing alliances in Austin family matters, an alliance between the Plan and Christy might also have been a risky proposition, even if she had been the successful bidder at the December 27, 1996 auction. Jaynes described the possibility of this agreement's consummation to be an "impossible dream", and acknowledged that the possibility of either a merger or creation of an ESOP to be "pretty slim".

would have given the Plan a "put option" that gives participants a right to require the employer to purchase the employer securities allocated to their account when they receive a distribution.[21]   Austin, Jr. was opposed to the merger.

Throughout the period subsequent to the signing of the agreement on October 29, 1996, Newman and Jaynes, as well as the Plan's attorney, continued to have concerns about whether or not Austin, Jr. could in fact finance the purchase of the Plan's Unaka shares.   Throughout this period, Austin, Jr. was asked for evidence of his ability to finance the deal.[22]   In fact, Nichols assured Neil Thomas, Christy's attorney, during the negotiations concerning the November 20 agreement between the Plan and Christy, that the letter of intent with Austin, Jr. would never be consummated because of Austin, Jr.'s lack of financing.   Sometime in mid-November, 1996, Konvalinka orally informed Nichols that $11,000,000.00 was available to Austin, Jr. and on December 2, 1996, Konvalinka confirmed to Nichols by letter that "Robert Austin has obtained a commitment from NationsBank[23]  in the amount of $8.5 million

_____

[21]   A "put option", of course, is only of value if the employer has the ability to purchase the shares.  In fact, converting the Plan to an ESOP, the assets of which might have been employer securities, was highly risky given Unaka's business climate.

[22]   As noted above, Austin, Jr. was under no obligation based upon the terms of the agreement to provide evidence of his financing; however, it would seem prudent on his part if he sincerely intended to purchase the shares to provide the requested information.

[23]   This representation was apparently false since Austin, Jr. never had any commitment from NationsBank.  The $8.5 million referred to in this letter refers to the money apparently available from William T. Rogers.  As previously set forth, Austin, Jr. had offered, by letter from his attorney dated November 22, 1996, to make a capital infusion into Rolich in the amount of $11,000,000.00, $2.5 million of which would be used to

which he _may_ (emphasis added) use in connection with the purchase of this stock or in connection with the retirement of the debt owed by Rolich Corporation to Unaka Company, Inc."

On December 12, 1996, the day after Rolich's board of directors declined to consider his subscription offer, Austin, Jr. offered to purchase the 382 Rolich shares owned by the Estate of at a price of $5,000.00 per share. On December 19, 1996, after receiving a competing offer from Christy for the Estate's 382 Rolich shares, the Estate's administrator established a procedure under which the administrator would accept offers for the Estate's shares until 5:00 p.m. on December 27, 1996. The Estate's administrator ultimately offered the Estate's Rolich shares for sale at a private auction on December 27, 1996. Austin, Jr. effectively gained control of Rolich (thus clearly defeating the proposed merger proposal) when he out bid Christy at the auction with a $4,000,000.00 offer for the Estate's shares.[24] Austin, Jr.'s bid was accepted by

---

settle the outstanding litigation involving Elizabeth Austin and Richard Roberts and to purchase their shares of Unaka stock. The additional $8.5 million would be made available to Rolich conditioned upon the receipt of several items, including the unanimous election of the shareholders and directors of Unaka and Rolich of one of two possible uses for those funds – (1) The payment of the debts owed by Rolich to Unaka or (2) The purchase by Rolich of the Unaka shares owned by the Plan. Attached to that letter, which was received by both Newman and Nichols, was a one paragraph document dated November 21, 1996 from Margaret C. Craig, Vice President of NationsBank, advising that a $2.5 million deposit had been made into the escrow account of Konvalinka and that funds in an amount not to exceed $8.5 million would be available for a period not greater than 60 days upon receipt of written instructions from Konvalinka.

[24] Newman and/or Jaynes had initially agreed with Christy that the Plan might agree to purchase the Estate's shares at the December 27, 1996 auction if she were the successful bidder. Just prior to the auction, after learning from Nichols that they could not do so, Newman and Jaynes informed Christy that the Plan could not participate. Jaynes and Newman, however, would accompany Christy to the auction and Jaynes offered beforehand to assist Christy in getting Greene County Bank financing for $1,000,000.00 plus another $500,000.00

the Estate on December 30, 1996 and closing was to occur on or before January 15, 1997.

Austin, Jr. closed the purchase of the Estate's Rolich shares on January 15, 1997, giving him control over Rolich and Unaka. Austin, Jr. had arranged financing for his purchase of the Estate's Rolich shares through First Union Bank. The loan agreement with First Union Bank provided that Austin, Jr. would incur no additional indebtedness without prior approval of First Union, except for existing indebtedness previously disclosed to First Union. Nothing in the record indicates that First Union consented to further indebtedness for Austin, Jr. to obtain the Plan's stock or that any existing indebtedness to be used for that purpose was disclosed to First Union. As security for Austin, Jr.'s $4.4 million personal loan from First Union, Austin, Jr. was required to pledge all of his Rolich and Unaka stock to First Union.

Prior to the closing of Austin, Jr.'s purchase of the Estate's Rolich shares, First Union became aware of and requested a copy of a May 2, 1992 stock restriction agreement entered into by Austin, Jr. and Christy which provided that neither party "shall sell, encumber, or otherwise dispose of any stock of Rolich Corporation without the express, prior written consent of the other party" unless the

---

from another source. The Estate's administrator did not invite Newman and Jaynes to the auction and the transcript of the auction reveals that both identified themselves as "observers." Newman, when identifying himself and his capacity at the auction, gave the odd response of: "Gordon Newman, Vice President/Treasurer of the bank. I'm an observer."

stock was first offered to the other party.  Austin, Jr. had not obtained written consent from Christy to sell or encumber his Rolich stock.  Both Austin, Jr. and Christy had apparently breached this agreement in the past.  First Union requested that Austin, Jr. obtain a written waiver from Christy of her rights under the May 2, 1992 stock restriction agreement.  With Christy apparently using the stock restriction agreement as leverage, the attorneys for Austin, Jr. and Christy entered into negotiations which resulted in the sale of Christy's Rolich and Unaka stock to Austin, Jr.  On or about January 13, 1997, two days before the First Union closing, Austin, Jr., Christy and her husband, Fagan, entered into a letter agreement for the purchase of their Rolich and Unaka shares by Austin, Jr.   Austin, Jr. agreed to pay Christy and Fagan $4,700,000.00 for their shares, plus assume certain debt for their Rolich shares at Greene County Bank.[25]  The $4,700,000.00 was to be paid partially through the receipt by Christy of her interest in the  Estate and through a note for the balance payable with 8% interest on or before April 15, 1997.  The security for the agreement was a second security interest in all of the Rolich shares owned by Austin, Jr., including the 382 Rolich shares Austin, Jr. was purchasing from the Estate, together with a security interest in the Unaka stock held by Austin, Jr.   The agreement between Austin, Jr., his sister and her husband required Christy and Fagan to sign a separate agreement by

---

[25]   The  price  paid  by  Austin,  Jr.  for  these  Unaka  shares  was  significantly  lower  than  the  price contemplated by the Nothung letter of intent.

January 15, 1997 consenting to Austin, Jr.'s pledge of all his Rolich and Unaka stock to obtain financing to purchase the Estate's Rolich shares. Christy and Fagan signed that agreement on January 15, 1997, enabling Austin, Jr.'s personal loan from First Union to proceed and allowing him to close the purchase of the Estate's Rolich shares that same day.

As of December 30, 1996, the date on which the Estate accepted Austin, Jr.'s bid, the only options left available to the Plan with respect to its Unaka stock were to continue to hold the stock or sell to Austin, Jr. pursuant to the letter of intent. Newman instructed Nichols to complete the Nothung deal by its deadline. On January 2, 1997, Nichols sent Konvalinka a letter[26] asking about the sources of Austin, Jr.'s funds for the proposed purchase of the Plan's Unaka shares. Nichols did not receive a response to this letter.[27] On January 13, 1997, two weeks before the letter of intent expired, Nichols sent Konvalinka a revised draft of the definitive stock purchase agreement, with two suggested changes, one of which was that signing of the stock purchase agreement would be simultaneous with closing,[28] and indicating that the Plan

---

[26] This letter is actually dated January 2, 1996; however, all parties agree that its actual date is January 2, 1997. In any event, the context clearly indicates that January 2, 1997 is the correct date.

[27] During a telephone conference on January 8, 1997, Konvalinka informed T. Arthur Scott, the administrator of the Estate, that Austin, Jr. had a financing problem.

[28] Nichols' insistence that the stock purchase agreement be signed simultaneously with closing was reasonable given that one of the concerns for an ERISA fiduciary is that he not be locked into an agreement that could require the sale of a Plan asset for less than fair market value. Mercer's draft valuation did, in fact, value the Plan's shares at $496.00 per share as of January 15, 1997.

would be ready to close the sale as soon as it received an updated valuation report from its financial advisor, Mercer Capital, "as of the date of closing." The letter also clearly indicated that Mercer Capital could complete an updated valuation report prior to the expiration of the letter of intent. Mercer had been provided with financial documents necessary to complete the valuation on a monthly basis. Also attached to the letter was a letter from Ken Patton at Mercer Capital calling into question whether $454 per share was fair market value of the Plan's Unaka stock.

On January 17, 1997, Austin, Jr.'s attorney replied by letter to Nichols' January 13 letter. This letter indicated that "a portion of the financing obtained by [Austin, Jr.]" had been used to address other matters.[29] Nichols interpreted this letter to mean that Austin, Jr. no longer had the financial ability to proceed with the transaction with the Plan. Konvalinka, on the other hand, testified that he only intended to convey "ever so subtly" to the Plan that Austin, Jr. would not pay any more than $454.00 per share for the stock and that if the Plan was attempting to seek a higher price, Austin, Jr. would not be interested.[30] The letter also rejected Nichols'

---

[29] The other matters were described in the letter as (1) the illiquidity of the Plan's Unaka stock, (2) the under capitalization of Rolich, and (3) "the lack of direction by reason of the divisiveness of ownership among the stockholders of Rolich."

[30] The letter does not say this anywhere. In fact, if Konvalinka intended by this letter to "subtly" convey that Austin, Jr. would pay no more than $454.00 per share, that subtlety was lost on Nichols and is lost on this Court. This January 17, 1997 letter written by Konvalinka can only reasonably be interpreted as indicating that Austin, Jr. no longer had all of the financing necessary to proceed with a purchase of the Unaka stock, an assumption made even more reasonable by the fact that Austin, Jr. had now closed his purchase of the Estate shares giving him control of both Rolich and Unaka and no longer needed the Plan's shares to gain control.

proposed change to the stock purchase agreement that provided for the simultaneous execution of the stock purchase agreement and the closing and indicated that "the lender has requested a period of time from the date" of the execution of the stock purchase agreement.[31]

On January 24, 1997 Mercer Capital, an evaluation firm, provided the Plan with draft valuation worksheets indicating that the fair market value of the Plan's Unaka stock was $496.00 per share as of January 15, 1997, an amount which exceeded the $454.00 per share price specified in the agreement. This evaluation, and all other prior evaluations conducted for the Plan, valued the Plan shares on a marketable minority basis, which plaintiffs now contend is an improper valuation basis since there was in fact no ready market for the Plan's shares. Given that these shares had historically been valued on a marketable minority basis, it was entirely reasonable for the Plan fiduciaries to continue to evaluate these shares on that basis. In any event, the question of whether or not it was proper to value the Plan's stock on a marketable or non-marketable basis appears to be a question of expert judgment and each of the valuation firms which had done prior appraisals determined that the method was

---

Austin, Jr. received a copy of Konvalinka's January 17 letter. He never contacted Konvalinka about the letter but testified that he would have done so if he thought there was any implication in the letter that he was not ready, willing and able to close the purchase of the Plan's Unaka shares.

[31] There is no evidence in the record that any lender, including Rogers, had made such a request. This also contradicts the testimony of both Konvalinka and Austin, Jr. that the Rogers money was available for this transaction subject only to instructions from Konvalinka to NationsBank.

proper. Likewise, the Plan's attorney believed that it was appropriate to continue

valuing the Plan's Unaka stock on a marketable minority basis and so advised the Plan

administrative committee.[32]

No further correspondence or other communication occurred between

Austin, Jr.'s attorney and the Plan's attorney subsequent to January 17, 1997.[33] [34] No

closing was arranged, Austin, Jr. did not appear with the money to close the

transaction on January 27, 1997 and the letter of intent expired according to its

terms.[35]

In order to finance the proposed purchase of the Plan's Unaka stock,

Austin, Jr. had to borrow the money from a third party and he did not have such

financing at the time of the signing of the letter of intent. In November, 1996, Austin,

---

[32]   The decision to value the Plan's stock on a marketable minority basis was apparently based on representations by the Plan administrative committee agreement that there was an agreement by the Austin family that Unaka would repurchase the Unaka shares at the request of the PAC. This "historical understanding" was based on the minutes of a PAC meeting wherein it was reported that Robert C. Austin, Sr. or Unaka Company was willing to repurchase the Plan's shares "at $220.00 at any time." The Plan had no put option and it is very doubtful that any "historical understanding" could have been enforced by the Plan.

[33]   Nichols' billing records indicate that he worked on a draft response to Konvalinka's January 17 letter. No response appears, however, to have been sent.

[34]   Jaynes testified that the Plan was still looking for a definitive stock purchase agreement in late January. As noted by Jaynes, Konvalinka was "an aggressive and reasonable lawyer" who "reacted quickly when it was in his client's interest to do so." The failure of Konvalinka to respond specifically to Nichols' proposed revisions to the draft agreement or to take any further steps toward a closing reflects a lack of sincere intent on the part of Austin, Jr. to go forward with the purchase of the Plan's Unaka stock.

[35]   There were further general discussions about a sale of the Plan's Unaka stock to Austin, Jr. even after the expiration of the letter of intent. As late as February 25, 1997, the PAC believed it to be in the best interest of the Plan to continue to pursue a possible sale to Austin, Jr. These discussions ended with the termination of the employment of Jaynes and Newman.

Jr. entered into an oral agreement with William T. Rogers ("Rogers") another of

Konvalinka's clients, for Rogers to make available to Austin, Jr. the sum of

$11,000,000.00, apparently to be used by Austin, Jr. to obtain a controlling interest in

Rolich.  By letter dated November 21, 1996, Margaret C. Craig, a vice president of

NationsBank, confirmed to Austin, Jr. that a deposit of  $2.5 million was made to the

escrow account of Austin Jr.'s attorney and that "upon the receipt of written

instructions from John P. Konvalinka, Esquire", an additional amount not to exceed

$8.5 million  would be made available for a period not greater than 60 days from the

date of the letter,  a date which is before the expiration date of the letter of intent.  No

notification of an extension of this 60 day period was ever received from

NationsBank.  There is no other written documentation of the agreement between

Austin, Jr. and Rogers except for a waiver of conflict signed by Austin, Jr. on

November 18, 1996 under which he consented to Konvalinka's representing Rogers in

the negotiations "relating to the acquisition of stock of Rolich Corporation."  Rogers,

on the same date, signed a similarly worded "waiver of conflict".

Konvalinka apparently had full authority from Rogers to make these

funds available to Austin, Jr.[36]   The full terms of the agreement between Austin, Jr.

---

[36]  Margaret Craig had provided written confirmation to the attorney for the  Mary T. Austin Estate that the Rogers' money was available "subject to no conditions except the instructions of . . .  Konvalinka . . .  as to their disbursements."

and Rogers are not entirely clear; however, it appears that Rogers was interested in financing a transaction in which Austin, Jr. could offer him control over Rolich and Unaka as collateral. Austin, Jr. was not satisfied with the terms of the Rogers agreement and thought the terms dangerous and the money too expensive.

Although Landes and Thompson were also members of the PAC, all responsibility for day-to-day management of PAC activities was essentially delegated to Newman, assisted by Nichols. Landes and Thompson often attended PAC meetings by telephone.[37] Also, during the relevant time period, Thompson's wife was suffering health problems which required his attention. Although Newman testified otherwise, it is clear that both Newman and Nichols failed on numerous occasions to make Landes and Thompson aware of certain developments related to the Nothung agreement as well as the Plan's dealings with Christy.[38] For instance, Landes and Thompson were never told of Newman's promise to assist Christy in gaining control of Rolich, were never provided with the Margaret Craig letter concerning the $11,000,000.00 in possible financing, were not provided the draft valuation worksheets from Mercer Capital in January, 1997, were not provided with copies of

---

[37] Nothing in the record indicates that Landes, who was President of SoPakCo and had an office in South Carolina, ever personally attended a PAC meeting.

[38] Jaynes also testified that he would have preferred to receive certain things from Newman and Nichols on a "more timely basis". There were numerous documents and correspondence that neither Landes, Thompson nor Jaynes had ever seen before this litigation was filed.

committee minutes for review and approval, were not provided with Nichols' billing records, were never told by Jaynes or Newman that the possibility of a successful merger and formation of an ESOP were essentially impossible, were never provided copies of Konvalinka correspondence and were never told that the escrow deposit had been made or that a stock purchase agreement had been drafted.

On the other hand, neither Landes nor Thompson made any effort to consult with or ask questions of the Plan attorney or to obtain, on their own initiative, information related to the ongoing negotiations. Neither appears to have familiarized himself with the Plan document or made any other preparation for service on the PAC. And, although it is somewhat understandable, neither appears to have been diligent in reading documents and/or asking appropriate questions during PAC meetings.[39]

Throughout the time period between January 27, 1997 and April 28, 1997, some general discussions continued concerning the possibility that Austin, Jr. might purchase the Plan's Unaka stock. These were never consummated, however, and effectively ended with Jaynes' termination from employment on April 28, 1997.[40]

Austin, Jr. was required, pursuant to his agreement with his sister,

---

[39] For instance, Thompson testified that he never read the proposed shareholder agreement with Christy Austin because he did not have time.

[40] Jaynes had resigned from the Rolich Board on January 9, 1997. Newman's employment with Unaka and its affiliates was terminated effective June 20, 1997. Landes and Thompson continued as employees of Unaka.

Christy, to pay the remaining balance for the purchase of the stock owned by Christy and her husband on or before April 15, 1997. As April 15, 1997 approached, Austin, Jr. was approximately $2,000,000.00 short of the money needed to meet his obligation to his sister. In order to meet that obligation, Austin, Jr. obtained an "undisclosed" loan from Meco, a subsidiary of Unaka, that was funneled through another company, Grane, Inc. to Austin, Jr., who in turn used those funds to pay the amounts due to Christy and Fagan for their Rolich and Unaka stock.[41]

On August 2, 1998, Henderson was appointed by Unaka as the trustee of the Plan. In conjunction with his engagement, STRINCO was appointed to act as the Plan's investment manager. Henderson is the founder and senior investment person at STRINCO. Henderson and STRINCO held their respective positions of Plan Trustee and Plan Investment Manager until July 5, 2001. Henderson and STRINCO are fiduciaries of the Plan within the meaning of ERISA § (3)(21)(A)(I), 29 *U.S.C.* § 1002(21)(A)(I). At the time Henderson became Plan Trustee, the Plan continued to own 14,000 shares of Unaka stock. The Plan also held 6,184 shares of Greene County Bancshares, another closely held company based in Greeneville, Tennessee. By July, 1998, these two assets made up approximately 50% of the Plan's assets.

---

[41] This loan to Austin, Jr. by Meco was cited by First Union in a letter dated November 10, 1997, as a default under the First Union credit agreement with Unaka which ultimately led to the termination of the relationship between First Union and Austin, Jr. and Unaka.

Case 2:99-cv-00267   Document 341   Filed 04/26/05   Page 30 of 87   PageID #: 707

Upon becoming the Plan's Trustee, Henderson conducted an 18 month review of the business of Unaka, its products, facilities, customers, management, financial condition, litigation history and ownership. As a part of his analysis, Henderson reviewed the Plan's participant base which revealed that many of the Plan's participants were at or very near retirement age. Some employees were working beyond retirement age. Given that many of the Plan's participants were at or near retirement age, Henderson determined that it was important for the Plan to increase it's liquidity so that it could meet its future obligations to participants as they retired.[42]

Based upon Henderson's review, he determined that the Unaka stock owned by the Plan represented a minority interest for which there was virtually no market in view of the consolidation of ownership in Austin, Jr. The Unaka stock had never paid any dividends, was not generating any income to the Plan and there appeared to be no future prospect of dividends. Henderson also determined that both of Unaka's subsidiaries, Meco and SoPakCo, were operating in declining industries in which there appeared to be little or no prospect for significant profitable growth. It also appeared quite clearly that any future prospects for appreciation in value of the

---

[42] The need for liquidity, however, was not immediate. The Plan had sufficient liquid assets to fund retirements of employees for several years. Clearly, however, a point would ultimately be reached where the liquid assets would be exhausted if the Plan's stock were not liquidated.

Case 2:99-cv-00267   Document 341   Filed 04/26/05   Page 31 of 87   PageID #: 708

Plan's Unaka stock were limited at best.

Henderson began to attempt to sell some of the Plan's Greene County Bancshares stock and was able to do so over a period of time. Henderson then turned his attention to the Plan's Unaka stock. Henderson determined that there had never been any offers for the purchase of the Plan's shares of Unaka stock other than the Nothung offer. Over the next ten (10) months, Henderson began to attempt to liquidate the Plan's Unaka shares. He first contacted all existing Unaka shareholders, as well as the current officers of Unaka and its affiliates, requesting that any party interested in purchasing the Plan's Unaka stock contact him directly. In July, 1999, Henderson began seeking bids for the Plan's Unaka stock. A formal notice of invitation to bid was forwarded all existing Unaka shareholders as well as the current officers of Unaka and its affiliates, was published in local and regional newspapers, including the *Wall Street Journal*, Eastern Section. Henderson also met with several regional and national investment banking firms about the likelihood of success of a private placement for the Plan's Unaka stock. Henderson's efforts resulted in only two private written offers for the stock – one for $5.00 per share and one for $13.00 per share. Henderson also began to investigate what he believed to be breaches of fiduciary duty by former Plan fiduciaries related to the Plan's failure to sell its Unaka stock to Nothung in late 1996/early 1997. Ultimately, Henderson instigated the present litigation against Newman and Jaynes on behalf of the Plan.

During the time Henderson was soliciting bids for the Plan's Unaka stock, Unaka made a proposal to him for the purchase of the stock. Unaka offered to purchase the stock from the Plan for fair market value. Unaka would then loan to the Plan the difference between the sum paid for the Unaka stock and $413.00 per share. The Plan would assign to Unaka its claims against Newman and Jaynes and Unaka would pay all litigation expenses related to prosecuting such claims in the form of an extension of credit. The loan to the Plan would be interest free and non-recourse and Unaka would only be repaid from the recovery by the Plan (if any) from the litigation.

In order to proceed with this transaction, Unaka and the Plan had to obtain a prohibited transaction exemption ("PTE") from the Department of Labor because of Unaka's status as a "party in interest" with respect to the Plan. Ultimately, the DOL issued PTE99-31[43] to cover the otherwise prohibited transactions between Unaka and the Plan. The Unaka proposal was attractive to the Plan for a number of reasons. First of all, the Plan's recovery would be guaranteed and immediate. The Plan would have cash up-front and would not be burdened with having to pay for any of the expenses associated with the litigation. Before finalizing the agreement with Unaka, however, Henderson sent out one final letter to all Unaka shareholders, related

---

[43] PTE99-31 express no opinion as to whether or not the stock sale would comply with the requirements of ERISA § 408(e), 29 *U.S.C.* § 1108(e), including the requirement that the transaction be for "adequate consideration." Nothing in PTE99-31 relieves the Plan from its requirement to meet the statutory exemption of ERISA § 408(e).

officers and directors, and other persons who he perceived as possibly having an interest in making an offer to purchase the Plan's Unaka stock (including Newman and Jaynes). Henderson received no further offers to purchase the Plan's Unaka stock by the submission deadline of May 15, 2000.

Henderson then proceeded to try to complete the sale of the Unaka stock to Unaka. Unaka initially offered only $5.00 per share to purchase the Plan's Unaka stock but ultimately increased its offer to $13.00 per share, an amount equal to the highest offer received by Henderson. Henderson engaged Willamette Management Associates ("Willamette"), a qualified independent evaluation advisor, to evaluate the transaction for overall fairness to the Plan. As part of that engagement, Willamette was also asked to perform an independent valuation of the Plan's Unaka stock. Henderson also engaged qualified independent legal counsel to advise him with respect to the proposed transaction.

Willamette determined that the consideration to be received by the Plan for its Unaka stock "was at least equal to the fair market value of such shares (as such term is used in determining "adequate consideration" under § 3(18) of ERISA)." In its analysis, Willamette concluded that the valuation for the Plan's Unaka stock was a range between $5.00 and $300.00 per share. Willamette's valuation also complied with all applicable requirements of the *Proposed Regulation* at 29 *C.F.R.* § 2510.3-18, which all experts who testified at trial testified established the standard to be used in

Page 34 of 87

determining adequate consideration under ERISA.[44]

The price offered by Unaka for the Plan's Unaka stock fell within the range of valuation provided by Willamette. The Plan received the sum of $182,000.00, representing the purchase price for the shares.[45] As previously agreed, the Plan assigned to Unaka the right to pursue breach of fiduciary duty claims against Newman and Jaynes with Unaka fronting all attorney's fees and costs associated with pursuing such claims. The Plan would reimburse Unaka for the litigation expenses and the loan principal from any recovery in the litigation against Newman and Jaynes with the Plan keeping any amounts recovered in excess of the total owed to Unaka.[46]

The effective result of the July 14, 2000 transaction with Unaka was that the Plan received an amount in cash equal to $413.00 per share for its Unaka stock regardless of the outcome of the litigation against Newman and Jaynes or the ability of Newman and Jaynes to satisfy any judgment rendered against them. As a result of the transaction, Unaka has borne all costs associated with the litigation as well as all of

---

[44] Willamette also issued a "bring-down" letter issued July 14, 2000, the date of the Plan's closing with Unaka, which expressed the opinion that the consideration received by the Plan for its Unaka stock "was at least equal to the fair market value of such shares . . ."

[45] 14,000 shares at $13.00 per share. The amount of the loan was $5,600,000.00.

[46] Henderson also negotiated with Unaka prior to closing for the execution of a "take-along" agreement which provided that in the event of a sale of the Plan's Unaka stock to some third party within two years, Unaka would, *inter alia*, make a contribution to the Plan of any sums received in excess of $413.00 per share. Upon receipt of the $5,782,000.00, Henderson invested those funds, with the Plan benefitting from the income derived from the amount invested.

the risk of litigation.

Approximately one year later, on June 30, 2001, Rolich and Unaka

merged.  Pursuant to the agreement and plan of merger, the separate existence of

Rolich ceased and Unaka remained the surviving corporation.  This merger would not

have occurred had the Plan still been a minority shareholder of Unaka or if any

shareholder had exercised dissenter's rights under *Tenn Code Ann.* §

8-23-102(a)(1)(A).[47]


## *THE STATUTORY  FRAMEWORK OF ERISA*

Congress enacted the Employee Retirement Income Security Act of 1974

("ERISA"), 29 *U.S.C.* § § 1001-1144 "after 'almost a decade of studying the nation's

Private Pension Plans' and other employee benefit plans."  *Central States, Southeast*

*and Southwest Areas Pension Fund v. Central Transport*, *Inc.*, 472 U.S. 559, 569, 105

S. Ct. 2833, 2839, 86 L.Ed. 2d 447 (1985).   Congress set out to "assur[e] the equitable

character  of [employee benefit plans] and their financial soundness." *Id.* at 570.

ERISA was designed to "protect . . . the interest of participants in employee benefit

plans and their beneficiaries . . . , by establishing standards of conduct, responsibility,

and obligation for fiduciaries of employee benefit  plans, and by providing for

---

[47] *Tenn. Code Ann.* § 28-23-102(a)(1)(A) provides that a dissenting shareholder is entitled to receive "fair value" for its shares.

appropriate remedies, sanctions, and access to the federal courts." 29 *U.S.C.* §

1001(b). ERISA accomplishes this goal by mandating that private pension plan

assets are to be held in trust for the exclusive benefit of plan participants and

beneficiaries. *Id.* § 1103(a). ERISA requires such plans to name fiduciaries who

shall have the authority to control and manage the operation and administration of the

plan. *Id.* § 1102(a)(1). These fiduciaries need not be an independent party; the

employer or plan sponsor may appoint its own "officer, employee, agent, or other

representative" to serve in a fiduciary capacity. *Id.* § 1108(c)(3)

An ERISA fiduciary "shall discharge his duties . . . solely in the interest

of the participants and beneficiaries" and must act "with the care, skill, prudence and

diligence under circumstances then prevailing that a prudent man acting in a like

capacity and familiar with such matters would use in the conduct of an enterprise of a

like character and with like aims." *Id.* § 1104(a)(1)(B). The duties charged to an

ERISA fiduciary are "the highest known to the law." *Chao v. Hall Holding Company,*

*Inc.,* 285 F. 3d 415, 426 (6th Cir. 2002) (quoting *Howard v. Shay*, 100 F. 3d 1484,

1488 (9th Cir. 1996)). The duties of a fiduciary are set forth in ERISA § 404(a)(1)

which states:

> . . . [a] fiduciary shall discharge his duties with respect to a
> plan solely in the interest of the participants and
> beneficiaries and –
> (A)    for the exclusive purpose of:
> (i)     providing benefits to participants and their

beneficiaries; and

(ii)    defraying reasonable expenses of administering the plan;

(B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C)    by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D)    in accordance with the documents and instruments governing the plan . . .

29 *U.S.C.* §  1104(a)(1).

   The Sixth Circuit has enumerated three general duties of pension plan fiduciaries under §  1104(a)(1).   The first is a "duty of loyalty" pursuant to which "all decisions regarding an ERISA plan  'must be made with an eye single to the interest of the participants and beneficiaries.'"   The second obligation imposed under ERISA, the "prudent man" obligation, imposes "an unwavering duty" to act both "as a prudent person would act in a similar situation" and "with single minded devotion" to those same plan participants and beneficiaries.   Finally, an ERISA fiduciary must "act for the exclusive purpose" of providing benefits to plan beneficiaries.  *Kuper v. Iovenko* 66 F. 3d 1447, 1458 (6th Cir. 1995)  (quoting *Berlin v. Michigan Bell Tele. Co.*, 858 F. 2d 1154, 1162 (6th Cir. 1988) and *Donovan v. Bierwirth*, 680 F. 2d 263, 271 (2nd Cir.) *cert. denied*,   459 U.S. 1069, 103 S. Ct. 488, 74 L.Ed. 2d 631(1982)).  If a fiduciary breaches "any of the responsibilities, obligations, or duties imposed upon fiduciaries"

Page 38 of  87

by ERISA, the fiduciary "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach . . ." 29 *U.S.C.* § 1109(a).   An action seeking relief under §  1109 may be brought by the Secretary of Labor, a participant, a beneficiary, or a fiduciary of the plan. *Id.* § 1132(a)(2).   Although an individual may bring a § 1109 claim, ERISA does not permit recovery by an individual who claims a breach of fiduciary duty; rather, breaches of fiduciary duty injure the plan, and, therefore any recovery under such a theory must go to the plan. *Kuper,* 66 F. 3d at 1452.  When enforcing the duties charged to an ERISA fiduciary, "the court focuses not only on the merits of the transaction, but also on the thoroughness of the investigation into the merits of the transaction."  *Chao*, 285 F. 3d at 426.

      ERISA  defines an "employee pension benefit plan" as any plan, fund, or program established or maintained by an employer to the extent that it provides retirement income to employees.  29 *U.S.C.* § 1002(2).   The term "employee pension benefit plan" and the term "employee benefit plan" are used interchangeably within the meaning of ERISA.  *Id.* § 1002(3).   The term "individual account plan" means a pension plan which provides an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account and any income, expenses, gains and losses.  *Id.* § 1002(34).

29 *U.S.C.* § 1107 permits an employee pension plan to acquire and hold qualifying employer securities[48] provided that the aggregate fair market value of employer securities held by the plan does not exceed 10% of the fair market value of the assets of the plan immediately after such acquisition.[49] A plan is defined as an "eligible independent account plan"(EIAP) by ERISA if it is an individual account plan which is also a profit sharing, stock bonus, thrift, or savings plan. *Id.*§ 1107(d)(3)(A). As set forth above, ERISA's prudent man standard of care requires the plan fiduciaries to diversify the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it clearly would not be prudent to do so. In the case of an EIAP, the diversification requirement and the prudence requirement, to the extent that it requires diversification, are not violated by acquisition or holding of qualifying employer securities. 29 *U.S.C.* § 1104(a)(1)(C) and (2). This special rule for eligible individual account plans reflects a "strong policy and preference in favor of investment in employer stock". *Fink v. Nat'l Sav.*

---

[48] "Qualifying employer security" means, among other things, stock issued by an employer of employees covered by the plan or by an affiliate of such employer. The Unaka stock held by the Plan in this case is a qualifying employer security.

[49] The 10% limitation with respect to acquisition or holding of employer securities does not apply to such pension plans if they explicitly provide in the plan document for greater investment in these assets. § 7.11 of the Unaka Plan document explicitly empowers the plan to acquire and to hold Unaka stock provided that, immediately after the acquisition of such securities, the fair market value of all of the plan's qualifying employer securities does not exceed 25% of total plan assets. The parties in this case have stipulated that the fair market value of all the Unaka common stock held by the plan did not exceed 25% of the fair market value of all of the plan's assets at the time the stock was acquired.

*and Trust Co.,* 772 F. 2d 951, 956 (D.C. Cir. 1985).

One type of eligible individual account plan is an "employee stock ownership plan" ("ESOP") which is an ERISA plan that invests primarily in "qualifying employer securities," which typically are shares of stock in the employer creating the plan. 29 *U.S.C.* § 1107(d)(6)(A). Congress envisioned that an ESOP would function both as an employee retirement benefit plan and a technique of corporate finance that would encourage employee ownership. *Kuper,* 66 F. 3d at 1457. Because of these dual purposes, ESOPs are not designed to guarantee retirement benefits, and they place employee retirement assets at much greater risk than the typical diversified ERISA plan. *Id.* The Sixth Circuit has clearly held that "despite this recognition that ESOPs place employee assets at a greater risk, the purpose of ESOPs cannot override ERISA's goal of ensuring the proper management and soundness of employee benefit plans." *Id.* These competing concerns, that is, Congress' intent to encourage the formation of ESOPs by passing legislation granting such plans special treatment on the one hand and the competing policy of ERISA, that of safe guarding the interest of participants in employee benefit plans on the other hand, make it more difficult to delineate the responsibilities of ESOP fiduciaries. The Sixth Circuit, along with the Third Circuit[50] has held that a proper balance between the

---

[50] *Moensch v Robertson*, 62 F. 3d 553 (3rd Cir., 1995).

purpose of ERISA and the nature of ESOPs requires that an ESOP fiduciary's decision to invest in employer securities be reviewed for an abuse of discretion. *Kuper,* 66 F. 3d at 1459. *Kuper* creates a presumption that a fiduciary's decision to remain invested in employer securities was reasonable. A plaintiff may then rebut this presumption of reasonableness by showing that a prudent fiduciary acting under similar circumstances would have made a different investment decision. *Id.*

Reasonable reliance upon advice received from the plan's legal and financial advisors may be a defense to a charge that fiduciaries have not acted prudently. Reliance on the advice of counsel or a financial advisor, however, without more, will not insulate a fiduciary from being found to have breached his fiduciary duties. *See, e.g. Donovan v. Mazzola*, 716 F. 2d 1226, 1234 (9th Cir. 1983), *cert. denied*, 104 S. Ct. 704 (1984). "Although securing an independent assessment from a financial advisor or legal counsel is evidence of a thorough investigation, *Martin v. Feilen*, 965 F. 2d 660, 670-71 (8th Cir. 1992), it is not a complete defense to a charge of imprudence." *Howard*, 100 F. 3d at 1489 (citing *Donovan v. Mazzola*, 716 F. 2d 1226, 1234 (9th Cir. 1983)). Further, "independent expert advice is not a 'whitewash'". *Id.* (citing *Donovan v. Bierwirth*, 680 F. 2d 263, 272 (2nd Cir. 1982); *Donovan v. Walton*, 609 F. Supp. 1221, 1227 (n. 10. S.D. Fla. 1985); *Cator v. Hergott & Wilson, Inc.*, 609 F. Supp. 12, 16 (N.D. Cal. 1984))" ; *Chao,* 285 F. 3d at 430. Three requirements must be met for a fiduciary to rely upon expert advice. The

fiduciary must (1) investigate the expert's qualifications, (2) provide the expert with complete and accurate information, and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances. *Id.* (citing *Howard*, 100 F. 3d at 1489).

Plaintiffs have the burden of proving not only that defendants breached their fiduciary duties, but also that such breach caused a loss to the plan. *Kuper*, 66 F. 3d at 1459; *Silverman v. Mutual Ben. Life Ins. Co.*, 138 F. 3d 98 (2nd Cir. 1998); *Willett v. Blue Cross*, 953 F. 2d 1335, 1343 (11th Cir. 1992); *Call v. Sumitomo Bank*, 881 F. 2d 626, 633 (9th Cir. 1989). ERISA's plain language also makes it clear that a fiduciary is personally liable to a plan <u>only</u> for losses to the plan resulting from the breach. 29 *U.S.C.* § 1109(a). Upon finding a breach of fiduciary duty resulting in loss to the plan, the court may award damages and award prevailing parties their reasonable and necessary fees and costs incurred in pursuing the breach of fiduciary duty claims. 29 *U.S.C.* § 1132(g).

# I.

The Court, *sua sponte*, raised the issue during trial as to the standing of certain of the parties to pursue their claims herein. The parties have briefed these issues for the Court and the Court will address these matters before examining the breach of fiduciary duty allegations.

### *Standing of Former Fiduciaries*

The plaintiffs, Landes and Thompson, have conceded that they had no standing as former fiduciaries to bring this lawsuit. Accordingly, the plaintiffs, Landes and Thompson, will be dismissed as plaintiffs in their capacity as former fiduciaries.

### *Standing of Unaka*

Unaka moved to be substituted as a party in this lawsuit as the assignee of the Plan in place of the trustee of the Plan. The Agreement for Purchase and Sale of Stock dated July 13, 2000, between the Plan Trustee, Henderson, and Unaka [Employer] provided as follows:

. . . .

2. Loan from Employer to Seller. Subject to the terms and conditions of this Agreement, the Employer agrees to make a loan to the Trustee, for the benefit of the Seller, in the principal amount set forth in 3(b) below (the "Loan") on or before the Closing Date. The Loan will be repayable solely from amounts recovered under 3(c) below.

3. Consideration. The consideration to be given by the Employer to the Trustee, for the benefit of the

Seller, for the Shares shall include the following: (a) ONE

HUNDRED EIGHTY TWO THOUSAND AND NO/100

DOLLARS ($182,000.00); (b) the Loan in the amount of

FIVE MILLION SIX HUNDRED THOUSAND AND

NO/100 DOLLARS ($5,600,000.00) from the Employer to

the Trustee for the benefit of the Seller; plus (c) the amount

recovered, if any, from the Responsible Fiduciaries in

excess of the unpaid balance of the Loan evidenced by the

Note and reasonable legal fees, expenses and costs incurred

by the Employer to pursue such claims (collectively, the

"Purchase Price"). Any such excess under (c) shall be

allocated directly to the accounts of Seller's participants.

    (emphasis added)

In addition, the Assignment of Claims, Exhibit "C" to the agreement provides:

> In exchange for such assignments by Assignor, Assignee, hereby agrees to remit to the Plan all amounts received from the Responsible Fiduciaries, if any, in excess of the unpaid balance of the Note between Assignor and Assignee (executed of even date herewith), minus reasonable legal fees, expenses and costs incurred by Assignee or paid by Assignee and incurred by Assignor in the pursuit of the Responsible Fiduciaries.

29 *U.S.C.* § 1132(a)(3), is the only section which would provide Unaka

with standing in this case. That section provides that:

> A civil action may be brought -
>
> ....
>
> > (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan....

As explained by the Sixth Circuit in *Cob Clearinghouse Corp. v. Aetna U.S. Healthcare, Inc.*, 362 F.3d 877, 881 (6th Cir. 2004).

> [C]ourts narrowly construe ERISA to permit only the parties specifically enumerated to bring suit. See *Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1073, 1081 (9th Cir.2000) (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 27, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)). See also *Teagardener v. Republic-Franklin Inc. Pension Plan*, 909 F.2d 947, 951 (6th Cir.1990) (narrowly construing proper parties under 29 U.S.C. § 1132(a)(1)). Indeed, <u>even an assignee of a participant, beneficiary, or fiduciary is generally not permitted to maintain an ERISA claim</u>. See *Simon v. Belwith Int'l, Inc.*, 3 Fed. Appx. 363, 364 (6th Cir.2001).

Therefore, the Court FINDS that Unaka as an assignee cannot maintain a breach of fiduciary duty claim. Accordingly, Unaka will be dismissed as a plaintiff in this lawsuit based on its lack of standing as an assignee.

Unaka also contends that it has standing to bring this lawsuit because Unaka, as the employer, is the plan administrator and therefore qualifies as a fiduciary. Whether an employer who is also an ERISA plan administrator is a fiduciary of the plan generally requires a detailed analysis of the employer's actions and whether those actions were performed in the employer's fiduciary capacity. See *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 718 (6th Cir. 2000). "[W]e must examine the conduct at issue to determine whether it constitutes 'management' or 'administration' of the plan, giving rise to fiduciary concerns, or merely a business decision that has an effect on an ERISA plan not subject to fiduciary duties." Id. See also *Cob Clearinghouse Corp.*, supra at 881-882. But even assuming that Unaka as an employer was a fiduciary who had a right to file suit pursuant to 29 *U.S.C.* § 1132(a)(3), Unaka never sued in that capacity and never asserted that basis for its substitution as a party in this lawsuit. Instead, Unaka relied solely on its status as an assignee of the Plan.

Because Unaka never asserted that it was a fiduciary prior to trial, Unaka cannot attempt to proceed as a fiduciary at this juncture. This Court will not speculate in regard to whether the negotiation of the stock sale and the assignment constitutes "management" or "administration" of the plan, which would give rise to fiduciary concerns, or whether the negotiation was merely a business decision that

had an effect on an ERISA plan not subject to fiduciary duties.

Even if Unaka could maintain its claims as an assignee or a fiduciary, Unaka's' desired remedy of compensatory damages payable to Unaka is not available as a remedy for a breach of fiduciary duty claim. It is clearly settled that a party alleging breach of fiduciary duties cannot seek personal remuneration. *Bauer v. RBX Industries, Inc.*, 368 F.3d 569, 582 (6th Cir. 2004); *Adcox v. Teledyne, Inc.*, 21 F.3d 1381, 1390 (6th Cir.1994). The assignment in this case specifically provides for remuneration to go directly to Unaka because the cash proceeds, if any, from any judgment or settlement of the litigation against the responsible fiduciaries must exceed the total amount of the loan plus the amount of the extension of credit before any amount will be allocated to the accounts of the participants of the Plan. Because the loan to the Plan was a non-recourse loan, the repayment of that loan also does not inure to the benefit of the Plan because even if there was no recovery, the Plan has no obligation to repay the loan or the extension of credit.

If Unaka were paid compensatory damages, this would be a violation of 29 *U.S.C.* § 1109(a) which provides that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make <u>good to such plan any losses to the plan</u> resulting from each such breach, and <u>to restore to</u>

such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate." (emphasis added)

The Sixth Circuit has repeatedly held that ERISA does not permit recovery by an individual who claims a breach of fiduciary duty. Instead, § 1109 contemplates that breaches of fiduciary duty injure the plan, and, therefore, any recovery under such a theory must go to the plan. *Kuper v. Iovenko*, 66 F.3d 1447, 1452-1453 (6th Cir. 1995); *Adcox v. Teledyne Inc.*, 21 F.3d 1381 (6th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 193, 130 L.Ed.2d 126 (1994); *Tregoning v. American Community Mut. Ins. Co.*, 12 F.3d 79 (6th Cir.1993), cert. denied, 511 U.S. 1082, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994); *Bryant v. Int'l Fruit Prod. Co.*, 886 F.2d 132, 135 (6th Cir.1989) (per curiam). These cases distinguish between a plaintiff's attempt to recover on his own behalf as Unaka attempts to do in this case, and a plaintiff's attempt to have the fiduciary reimburse the plan.

Therefore, the Court FINDS that, even if Unaka had standing, the assignment and the relief that Unaka seeks are contrary to the provisions of 29 *U.S.C.* § 1109(a). Because this assignment violates the provisions of 29 *U.S.C.* § 1109(a), the Court FINDS that it is preempted by ERISA and ineffective to constitute a valid assignment of the claim of any other party who may have standing

to recover any loss to the Plan.

### ***Standing of Former Participants***

When this lawsuit was filed, the plaintiff Landes and counter-plaintiff Jaynes were participants in the Plan. It is undisputed that prior to the trial of this cause, each of them elected to receive a lump sum distribution of his plan account and that they are no longer plan participants. Although Jaynes contends that he might be entitled to some future benefits, he cites no Plan provision that would support his position. Both Landes and Jaynes contend that because they had standing at the time that their complaint was filed, they have standing now because standing is established at the time of filing of the complaint.

However, this argument ignores the clearly established principle that to qualify as a case fit for federal-court adjudication, "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Preiser v. Newkirk*, 422 U.S. 395, 401(1975) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459, n. 10 (1974). See also *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (a party's suit becomes moot when that party no long has an interest in the litigation). The Sixth Circuit has, however, recognized an exception to the general rule that a person who terminates his right to belong to a plan cannot have standing as a "participant" in the plan in *Swinney v. General Motors Corp.*, 46

F.3d 512, 518-519 (6th Cir. 1995):

> In construing § 1002(7) of ERISA in conjunction with
> traditional standing concepts, we, along with a majority of
> circuits, have developed an exception to the general rule
> that a person who terminates his right to belong to a plan
> cannot be a "participant" in the plan. Specifically, if the
> employer's breach of fiduciary duty causes the employee to
> either give up his right to benefits or to fail to participate in
> a plan, then the employee has standing to challenge that
> fiduciary breach. *Mullins v. Pfizer*, 23 F.3d 663, 668 (2nd
> Cir.1994); *Vartanian*, 14 F.3d at 702; *Astor*, 7 F.3d at
> 539; *Drennan*, 977 F.2d at 250; Christopher, 950 F.2d at
> 1221. Otherwise, a fiduciary could defeat an employee's
> standing to bring an ERISA action by duping him into
> giving up his right to participate in a plan. ERISA should
> not be construed to permit the fiduciary to circumvent his
> ERISA-imposed fiduciary duty in this manner.
> Christopher, 950 F.2d at 1221.

However, in this case, Landes and Jaynes have never contended that
any fiduciary's breach of fiduciary duty caused them to either give up their right to
benefits or caused them to fail to participate in the plan.  Therefore, this exception
does not apply, and Landes and Jaynes have no standing as former participants, and
they will be dismissed as plaintiffs in this capacity.

## Standing of Current Participants

As current participants in the Plan, Thompson and Newman do have standing
to pursue their breach of fiduciary duty claims pursuant to 29 *U.S.C.* § 1132(a)(3).
The argument by Newman and Jaynes that since Henderson has assigned the Plan's

fiduciary breach claims to Unaka there are no claims left for Landes or Thompson to pursue is without merit. The cases relied upon by Newman and Jaynes that the decision to assign a fiduciary breach claim is itself a fiduciary act do not support their position that a Plan participant could thereafter not pursue a breach claim on his own. It is inconceivable that Congress could have intended such a result. While it is true that the Plan, its participants or beneficiaries might have a fiduciary breach claim against Henderson and STRINCO for assigning the claims, it does not follow that a participant could not also sue, on behalf of the Plan, for loss to the Plan. Therefore, the Court will address the merits of the claims of Thompson and Newman.

## II.

### *THE STANDARD OF REVIEW AS TO FIDUCIARIES NEWMAN AND JAYNES*

The Unaka Company Incorporated Employees Profit Sharing Plan and Trust qualifies as an eligible individual account plan (EIAP) within the meaning of ERISA § 407(d)(3), 29 *U.S.C.* § 1107(d)(3). The plan meets the requirements of §1107(d)(3)(A)(i) because it is an individual account plan which is "a profit sharing, stock bonus, thrift, or savings plan." It satisfies 29 *U.S.C.* § 1107(d)(3)(B) because Section 7.11 of the Plan document explicitly provides for acquisition and holding of qualifying employer securities.

While all parties agree that the Plan qualifies as an EIAP, the implications of such designation are seriously in dispute. Newman and Jaynes argue that their decision[51] to remain invested in Unaka is reviewed only for abuse of discretion and that the Court must "presume that a fiduciary's decision to remain invested in employer securities was reasonable." *Kuper*, 66 F. 3d at 1459.[52] Plaintiffs on the other hand argue that plans that do not qualify as ESOPs and that are specifically designed to guarantee retirement benefits should be held to a higher standard of prudence than their ESOP counterparts when it comes to considering such plan's needs for diversity in conjunction with the holding of employer stock. The defendants further argue that all EIAPs, whether ESOPs or not, are treated the same for the purpose of fiduciary duty analysis and urges this Court to conclude that all EIAPs are designed primarily for acquisition and holding of qualifying employer securities and not for the primary purpose of providing employee pension benefits.

Defendants urge upon this Court the reasoning of Judge Higgins in *Landgraff v. Columbia HCA Healthcare Corp. of America*, 2000 WL 33726564 (M.D.

---

[51]   The Court notes that the position of Newman and Jaynes that they made a "decision" to continue to remain invested in Unaka is contradicted by the record in this case. Both Newman and Jaynes testified, and the documentary evidence establishes, that they believed that the Plan's Unaka stock should be sold and that it was the action of Austin, Jr. that prevented a consummation of the sale.

[52]   *Kuper* dealt with the duties and liabilities of  ESOP fiduciaries and defendant argues that the holding of *Kuper* is equally applicable to the Plan at issue because ESOPs are a type of EIAP and are subject to the same legal standards as EIAPs.

Tenn. 2000) where the court found the *Kuper* court's reasoning with respect to ESOPs

to be instructive with respect to other types of EIAPs.   Finding the reasoning of the

Sixth Circuit in its decision in *Kuper* to apply a presumption of prudence to the actions

of ESOP fiduciaries to be instructive, the Middle District Court found that the same

standard by which the actions of ESOP fiduciaries are measured should be  applied to

all EIAPs.   This Court must respectfully disagree.   First of all, there is no Sixth

Circuit precedent which extends the holding of *Kuper* to all EIAPs.[53]  Secondly, all of

the proof at trial was to the effect that the Unaka Plan was designed to provide

retirement benefits to the employees of Unaka and its affiliates and that the provision

of the Plan permitting the holding of certain employer securities was merely incidental

to that purpose.  The proof was further that the Plan had acquired its Unaka stock not

because of the language of the Plan allowing it to do so but rather because of  Austin,

Sr.'s need to raise capital during his leveraged buy-out of Rolich and at a time when

Austin, Sr. needed to infuse capital into Unaka.  In reviewing a fiduciary's actions, the

court must be governed by the intent behind the plan.  *Moench v Robertson*, 62 F. 3d

553, 571 (3rd Cir. 1995), *cert. denied* 516 U.S. 1115, 116 S. Ct. 917, 133 L.Ed. 2d 847

(1996).   The purpose of this plan was clearly to provide retirement benefits to

---

[53]   The *Landgraff* decision was reviewed on appeal by the Sixth Circuit but the Sixth Circuit did not discuss or specifically decide whether or not the district judge had properly applied a presumption of reasonableness.  *See Landgraff v. Columbia/HCA Healthcare Corp.*, 30 Fed. Appx. 366 (6th Cir. 2002).   The Ninth Circuit, on the other hand, has held that all EIAPs are subject to the same legal standards.  *See Wright v. Oregon Metallurgical  Corp.*, 360 F. 3d 1090 (9th Cir. 2004).

employees.

For these reasons, the Court FINDS that the actions of the fiduciaries of this Plan are to be judged by the prudent man standard and that no presumption of reasonableness attaches to the decision of the fiduciaries, if that is what it was, to continue to hold the Unaka stock in the Plan. The Court also notes that this is largely an academic debate between the parties since the presumption of prudence may be rebutted by a plaintiff by showing "that a prudent fiduciary acting under similar circumstances would have made a different investment decision." *Kuper*, 66 F. 3d at 1459, and the Court also notes that its decision would have been the same in this matter no matter which standard applies.

## III.

### *THE BREACH OF FIDUCIARY CLAIMS AGAINST NEWMAN AND JAYNES*

Plaintiffs in this action claim that defendants Newman and Jaynes breached their fiduciary duties to the Plan and its participants by, among other things, failing to consummate the agreement to purchase Unaka stock entered into with Nothung in October of 1996; by failing to pursue the sale of Unaka stock under the letter of intent; and by concealing from other Plan fiduciaries the fact that Nothung (or Austin, Jr.) had sufficient financing to complete the transaction. They also charge Newman and Jaynes with misrepresenting or concealing from other Plan fiduciaries other relevant facts including a valuation opinion dated December 10, 1996, from

Mercer Capital, concerning the worth of Unaka stock. Plaintiffs claim that defendants Newman and Jaynes were not acting in the best interest of the Plan and its participants but in their own interest by aligning themselves with Christy and Fagan in an attempt to block Austin, Jr. from obtaining a controlling share of Unaka stock and to protect their positions as managers of Unaka.

Almost immediately upon the execution of the letter of intent on October 27, 1996, Austin, Jr., Newman and Jaynes became participants in a bare knuckled battle for control of Rolich and Unaka. This Court is convinced that none of the participants in that battle fully or sincerely considered the potential impact of their actions upon the participants and beneficiaries of the Plan.[54] This Court FINDS that Newman and Jaynes were motivated during the period of time between the execution of the letter of intent and the Mary T. Austin Estate sale by their desires, whether self serving or not, to prevent Austin, Jr. from gaining control of these companies. Even though all members of the PAC and the Plan's legal counsel agreed that a sale of the Unaka stock held by the Plan was in the best interest of the Plan, they took no steps during that period of time toward consummating the agreement or in pursuit of the sale of the Unaka stock under the letter of intent. Not only that, Newman and Jaynes,

_____

[54] Of course, Austin, Jr. and his siblings were under no fiduciary duty to the participants or beneficiaries of the Plan. Jaynes and Newman, on the other hand, owed their undivided loyalty to the participants and beneficiaries of the Plan.

and Nichols at their direction, initially engaged themselves in a course of action affirmatively designed to thwart the consummation of the agreement for the sale of the stock to Austin, Jr. Whether motivated by their own self interest believing that their jobs were in jeopardy should Austin, Jr. win the battle for control or whether they were motivated out of heart felt concern for the companies they had worked for for many years, it is beyond doubt that Newman and Jaynes sought to ally themselves with anyone (primarily Christy and her husband, Fagan) who might be able to achieve their goal of preventing Austin, Jr. from taking control over these companies. Along the way, they also failed to fully inform Landes and Thompson of relevant information and, in some cases, intentionally concealed relevant information from them. These actions by Newman and Jaynes clearly fell short of discharging their duty "with the care, skill, prudence, and diligence" required of a Plan fiduciary. Their decisions were not made "with an eye single to the interest of the participants and beneficiaries" of the Plan nor did they act for the exclusive purpose of providing benefits to Plan beneficiaries.[55]

---

[55] This does not mean to suggest, however, that the Court finds Landes and Thompson to be without fault. Landes and Thompson, and to a lesser extent, Jaynes, effectively abdicated their roles as fiduciaries of the Plan and delegated all responsibility for the operation of the Plan to Newman and Nichols. While documents and other relevant information were not made available to Landes and Thompson on a timely basis, Landes and Thompson cannot escape responsibility for the actions of Newman and Jaynes. Landes and Thompson made absolutely no investigation about their fiduciary duties and did not make any attempt to educate themselves about the history and workings of the Plan. For instance, neither ever examined the Plan documents nor did they ever seek information about the progress toward consummation of the letter of intent directly from Austin, Jr. or from the Plan's attorney, Nichols.

Defendants justify their actions by asserting that they were obligated to look at other alternatives that might have greater benefit to the participants and beneficiaries of the Plan and that, for instance, their agreement with Christy, if completed, would have resulted in the creation of an ESOP and a merger of Rolich and Unaka and would have ultimately benefitted the Plan to a greater extent than the proposed sale of the Plan stock to Austin, Jr. While this may be theoretically true, Jaynes, and to a lesser extent, Newman, clearly knew that the prospects of completion of their agreement with Christy were nearly non-existent. Throughout the period between October 27, 1996 and December 27, 1996, Plan's counsel, Nichols, was intimately involved in the activities that were taking place. He was in almost daily contact with either Newman or Jaynes and was involved in the drafting of almost all of the relevant documents as well as participating in and preparing the minutes of all Plan administrative committee meetings. Nichols' advice to Newman and Jaynes that they were under no duty to sell the Plan stock and that they in fact had a duty to pursue alternatives to the letter of intent was not reasonable under the circumstances. It is not sufficient for defendants to claim that they were simultaneously pursuing various alternatives, including the Austin, Jr. sale, when the record is devoid of any proof that the fiduciaries of this Plan took any action between October 27, 1996 and December 27, 1996, to consummate or move toward the consummation of the agreement with Austin, Jr. for the purchase of the Plan's stock.

A finding by this Court, however, that Newman and Jaynes breached their fiduciary duties to the Plan is not the end of this Court's inquiry. Plaintiffs must not only prove that the defendants breached their fiduciary duties but must also establish that any such breach caused a loss to the Plan. *Kuper*, 66 F. 3d at 1459. In other words, did the breaches of fiduciary duty by Newman and Jaynes between October 27, 1996 and December 27, 1996 cause monetary loss to the Plan? To answer this question, the Court must address two questions, e.g. whether Austin, Jr. had the financial ability to consummate the purchase of the Plan's shares and also, assuming that he had financing, whether or not he would have in fact consummated the purchase. The answer to these two questions requires a detailed analysis of the events occurring between December 28, 1996 and January 27, 1997.

### *Austin, Jr.'s Financing*

The proof in the record concerning Austin, Jr.'s ability to finance the purchase of the Plan's Unaka stock is less than overwhelming. As noted earlier, the letter of intent did not require Austin, Jr. to provide proof of his financing to the Plan prior to the closing of the sale of the Plan's stock; however, that is of little help to this Court.

The primary evidence in this record with regard to Austin, Jr.'s ability to finance the proposed transaction is a November 21, 1996 letter signed by Margaret C. Craig, Vice President of NationsBank in Nashville, Tennessee, and the testimony of

Austin, Jr. and Konvalinka that the money referenced in the letter was available to

Austin, Jr. for the purpose of the purchase of the Plan's Unaka stock.    The letter,

addressed to Austin, Jr.,  advised that a deposit of $2.5 million was made on

November 21, 1996 into the escrow account of Konvalinkia.   In addition, "upon the

receipt of written instructions from John P. Konvalinka, Esquire" funds in an amount

not to exceed $8.5 million "will be made available for a period not greater than 60

days from the date hereof . . ."

   This letter does not reference any purpose for which the money is being

made available.  The letter first appeared as an attachment to a November 22, 1996

letter from Konvalinka to a distribution list of 13 attorneys, all of whom were involved

in the negotiations to achieve a "global settlement" of the various lawsuits involving

Rolich, Unaka and the Austin siblings.   Konvalinka attached the NationsBank letter

as evidence of Austin, Jr.'s ability to finance his proposal to infuse $11 million in

capital into Rolich.   On December 2, 1996, Konvalinka wrote to Nichols that "Robert

Austin has obtained a commitment from NationsBank in the amount of $8.5 million

which he may use in connection with the purchase of [the Plan's] stock or in

connection with the retirement of the debt owed by Rolich Corporation to Unaka

Company, Inc."  (emphasis added).  On December 3, 1996, Austin, Jr. proffered the

same NationsBank letter to the directors of Rolich and Unaka, again as evidence of his

ability to finance an $11 million stock subscription offer in connection with a

recapitalization of Rolich.  Austin, Jr. later presented the same NationsBank letter to

the Mary T. Austin Estate's administrator, T. Arthur Scott, at the December 27, 1996

auction of the Estate's Rolich stock.   Except for the disjunctive  reference in

Konvalinka's December 2, 1996 letter, there is nothing in the record to indicate that

Austin, Jr. or Nothung ever presented the NationsBank letter to Jaynes and Newman

as evidence of Austin, Jr.'s or Nothung's financial ability to purchase the Plan's

Unaka stock.

The money referenced in the November 21, 1996 letter from Margaret C.

Craig did not represent a commitment by NationsBank to loan money to Austin, Jr. for

the purpose of financing a purchase of the Plan's stock.   Rather, the money referenced

in that letter was apparently money committed by another, now deceased, Konvalinka

client, William T. Rogers.  The money referred to in the letter, referred to by

Konvalinka as a "direct pay" letter of credit, was never deposited into an account over

which Austin, Jr. had signatory authority.  There were no signed or written agreements

between Austin, Jr. and either NationsBank or Rogers or between Rogers and

NationsBank concerning the use of this money.   No document existed setting forth the

scope of Konvalinka's authority to instruct NationsBank concerning the availability of

Rogers' funds.

Both Austin, Jr. and Konvalinka acknowledge that Rogers was only interested in financing a transaction in which Austin, Jr. gained control over Unaka.[56] Austin, Jr. had paid a very substantial commitment fee to Rogers in connection with the money referred to in the Craig letter and the terms of this loan from Rogers to Austin, Jr. made the financing very expensive.[57] On January 23, 1997, four days before the expiration of the letter of intent, Konvalinka instructed NationsBank to return to Rogers the $2.5 million that previously had been transferred to Konvalinka's trust account. Austin, Jr. acknowledged that he did not have financing for the purchase of the Plan's shares in early February, 1997 and documents in the record establish that as well. Nothing in the record indicates that Austin, Jr. would have been able to extend the availability of the Rogers money beyond the 60 day period referred to in the letter.[58]

Considerable uncertainty existed, therefore, as to whether or not Austin, Jr. could in fact finance his purchase of the Plan's Unaka shares; however, the

---

[56] A control position in Unaka could not have been achieved simply through the purchase of the Plan's Unaka stock by Austin, Jr.

[57] Under Austin, Jr.'s arrangement with Rogers, he paid a $100,000 fee up front, was obligated to pay all of Rogers' expenses in connection with the arrangement and a fee of 10% of whatever Austin, Jr. used ($635,600 if Austin, Jr. used Rogers' money to pay the $6,356,000 purchase price for the Plan's Unaka shares). Although the proof was contradicting on the point, it also appears that Austin, Jr. would have been required to pledge his stock to Rogers or, at the very least, agree to give up his voting rights if Rogers was not repaid in one year. Austin, Jr. himself referred to this financing as "expensive" and also as "exotic and dangerous."

[58] This 60 day period ended approximately one week before the expiration of the letter of intent.

evidence slightly preponderates in his favor in that regard and this Court FINDS that Austin, Jr. did in fact have access to sufficient financing with which he could have closed the purchase of the Plan's Unaka shares before the expiration of the letter of intent.

### *Austin, Jr.'s Intent to Close the Transaction*

A finding that Austin, Jr. had sufficient financing to consummate his purchase of the Plan shares does not resolve the question, however. For the reasons set forth below, this Court FINDS that, even if sufficient financing were available to Austin, Jr., Austin, Jr. never intended to consummate the purchase of the Plan's shares pursuant to the terms of the letter of intent after he acquired control of Rolich through the purchase of the Estate shares on December 27, 1996. The record in this case is totally devoid of any affirmative act taken by Austin, Jr. or by Konvalinka on his behalf to effect the purchase of the Plan's shares after December 27, 1996 but before the expiration of the letter of intent on January 27, 1997.[59]

While stating an intent to go forward with the transaction,[60] Austin, Jr.

---

[59] In fact, Austin, Jr. had no real incentive to actively pursue a purchase of the Plan's shares afer December 27. He was scrambling to work out problems with his financing by January 15, 1997 the date his payment to the Estate was due. Assuming he could close the purchase of the Estate stock on that date, he had control of both Unaka and Rolich without acquiring the Plan's stock. The market for the Plan's shares, already limited, had now became practically non-existent and although Austin, Jr. might want to rid himself of a potentially bothersome minority shareholder, he could clearly wait for a better deal with the Plan, i.e. a price far more attractive than $454.00 per share.

[60] Austin, Jr. testified that he had "$5,782,000 George Washingtons sitting on the table" for the purchase of the Plan's Unaka stock.

was invited by Jaynes in December, 1996 to "sit down and get this thing moving forward toward a definitive agreement." Austin, Jr. replied that his attorney had advised him not to talk to the Plan. Although Konvalinka had forwarded to Nichols an unsigned draft stock purchase agreement on December 12, 1996, the draft agreement was unsigned by Austin, Jr. and came forty four (44) days after the signing of the letter of intent. More telling, however, as to Austin, Jr.'s lack of intent to go forward with the purchase of the Plan's stock is his lack of action after December 27, 1996.[61] As set forth above, Nichols sent to Konvalinka on January 13, 1997 a revised draft of a definitive stock purchase agreement indicating that the Plan was ready to close the contemplated sale of the Plan's shares as soon as it had received an updated valuation report. At this time, Mercer Capital could have completed an updated valuation report in time to consummate a sale of the Plan's Unaka stock prior to the letter of intent's expiration. On January 17, 1997, Konvalinka responded to Nichols' letter, not just with a reaction to the revised draft stock purchase agreement, but rather with a letter which indicated that Austin, Jr. had used a portion of his financing "to

---

[61] In point of fact, Austin, Jr. and Konvalinka did very little prior to December 27 to effect a consummation of the purchase of the Plan's stock, except for a flurry of activity in early December (deposit of the escrow money, preparation of a draft escrow agreement and preparation of a draft stock purchase agreement). Most of their efforts appear to have been aimed at Austin, Jr.s effort to gain control of Rolich. Austin, Jr. also attempted in November, 1996, to negotiate with Christy an agreement that would have, among other things, maintained parity of ownership in Unaka between them, a position inconsistent with his acquisition of the Plan's Unaka shares. It is possible that Austin, Jr. was using the letter of intent and the early December flurry of activity to try to prevent the Committee from an alliance with Christy or other action to prevent him from gaining control of Rolich.

address . . . other issues."[62]  Konvalinka thereafter never sent Nichols a further

revised draft of the stock purchase agreement, never indicated that Nothung was

willing to execute such an agreement[63] and never indicated that Austin, Jr. had

resolved the financial difficulties reflected in Konvalinka's January 17, 1997 letter.

Austin, Jr. likewise never sought any extension of the letter of intent nor, more

importantly, did he ever seek an extension of his agreement with Rogers.[64]

There are other factors, especially when considered collectively, that also

---

[62]  This letter also calls into question the existence of the necessary financing on Austin, Jr.'s part. While acknowledging that the Plan preferred a stock purchase agreement to be signed on the day of closing, Konvalinka indicated that Austin, Jr. needed a period of time after the signing of such agreement because "the lender has requested a period of time from the date that my client has received an executed stock purchase agreement." This may indicate that the Rogers' money was simply unavailable or it may indicate that Austin, Jr. saw the use of the Rogers' money to be a last resort because it was both expensive and its terms "dangerous".

[63]  Unaka argues that Newman and Jaynes had no intention of ever going forward with the transaction and point to several  statements made by Nichols, the Plan's attorney, including statements in a January 29, 1997 letter from Nichols to Konvalinka.  In that letter, written just after expiration of the letter of intent, Nichols "confirm[ed]" that a valuation report from Mercer Capital valued the Plan's Unaka shares "in excess of $454.00 per share" and that the Plan would have had no obligation to sell to Nothung pursuant to the letter of intent dated October 27, 1996.  The representation about this "recently concluded valuation report" was false.  It is entirely possible that neither Newman and Jaynes, nor Austin, Jr., had a good faith intention of going forward.  Such a finding would not change the Court's analysis.
    What the Plan had received from Mercer Capital was a letter on January 9, 1997, from Kenneth W. Patton which indicated that Unaka's financial condition had improved, that the $454.00 per share price reflected "at least a portion" of the improvement and that "the current fair market value of the stock could be higher depending upon a full investigation of the situation."  Mercer's worksheets did  indicate a preliminary valuation slightly higher than $454.00 per share.  Nichols also received a <u>draft</u> valuation on January 24, 1997 which indicated a $496.00 per share value.  The April, 1997, valuation indicated a range of value of $440.00 – $530.00 per share which represented a range of plus or minus ten percent (10%) from a specific price of $489.00 per share.  Austin, Jr. clearly indicated during his trial testimony that he did not intend to pay more than $454.00 per share.

[64]  Austin, Jr. also argues that he could have obtained conventional financing to purchase the Plan's stock because, after he gained control of Rolich, the financial institutions " loved me."  Such an assertion is simply not borne out by the record given Austin, Jr's. ultimate inability to arrange conventional financing for his payment to Christy Austin for the purchase of her Rolich and Unaka stock for which he was $2 million short on April 15, 1997.  Austin, Jr. made up the short fall in the amount due Christy Austin through a $2 million loan  from Meco to a shell corporation set up by Austin, Jr. and Konvalinka.

indicate Austin, Jr.'s lack of intent. For one thing, an eager purchaser would have immediately forwarded draft documents to the Plan, rather than waiting 44 days to do so. For another, Austin, Jr.'s various other proposals made during the same time frame, especially his early November proposal to infuse $11 million in capital into Rolich, created the reasonable perception that he was pursuing other avenues of control that were inconsistent with acquisition of the Plan stock. Moreover, by mid-January, Austin, Jr. had committed himself to pay Christy and Fagan approximately $5.1 million for their stock and to pay $ 4 million for the Estate stock.[65] In addition, as Austin, Jr. acknowledges, the price per share of not less than $454.00 he would have paid for the Plan's Unaka shares was an amount significantly higher than the actual value of the shares and an amount significantly higher than he had paid for Christy's shares. Why would Austin, Jr. want to close when the price could only go down? Newman and Jaynes suggest that Austin, Jr. needed the shares to make a potentially bothersome minority shareholder go away. However, the prior shareholder litigation had not been successfully pursued to conclusion and prudent fiduciaries likely could not have justified the expense of "long shot" or "nuisance" litigation. Some suggestion was made at trial of tax advantages to Austin, Jr. of merging Rolich

---

[65] Austin, Jr. financed the purchase of the Estate stock with a $4.4 million personal loan from First Union Bank. After deducting a payment to Christy of $1.5 million representing her share of her mother's estate, Austin, Jr. owed Christy $3.6 million to be paid on April 15, 1997.

and Unaka and elimination of the inter-company debt, although this testimony was not fully developed. In any event, there was no showing that these undefined advantages were sufficient to justify Austin, Jr. paying $454.00 per share.

The Court **FINDS** that the fiduciary breaches of Newman and Jaynes, while serious, between October 27, 1996 and December 27, 1996, did not cause monetary loss to the Plan and the complaint against Newman and Jaynes will be dismissed.

## IV.

## THE PROHIBITED TRANSACTION CLAIM AGAINST UNAKA, HENDERSON AND STRINCO

In January, 1999, Unaka applied to the United States Department of Labor (DOL) for an exemption from ERISA's prohibited transaction rules after Unaka, a "party in interest", had offered to purchase the Plan's Unaka stock for fair market value. As part of the same transaction, Unaka offered to loan the Plan the difference between the sum paid for the Unaka stock and $413.00 per share provided the Plan would also assign to Unaka the right to pursue its claims against Newman and Jaynes. Unaka agreed to pay all litigation expenses relating to prosecuting such claims in the form of an extension of credit. The loan and extension of credit to the Plan would be interest free and non-recourse and Unaka would only be repaid from the Plan's

recovery, if any, from the litigation.   To the extent that the amount received in the litigation was greater than the loan amount plus the amount expended by Unaka in litigation related fees, the Plan would receive the excess.

The process of obtaining a prohibited transaction exemption (PTE) from the DOL took several months.  On July 27, 1999,  the DOL issued  PTE  99-31 to cover the otherwise prohibited transactions contemplated by Unaka and the Plan. Henderson ultimately closed the transaction contemplated by PTE 99-31 on July 13, and July 14, 2000.   As a result, the Plan received a total of $5,782,000.00 on July 14, 2000 which is an amount equivalent to $413.00 per share for the Plan's Unaka shares.

Provided the conditions specified in PTE 99-31 are satisfied, the exemption relieves the  transactions covered by the exemption from the restrictions imposed by ERISA § 406(a)(1)(A-D), 406(b)(1) and (b)(2), and the sanctions resulting from application of IRC § 4975.   PTE 99-31 provided no relief for the sale of the Plan's Unaka stock to Unaka and the sale had to meet the requirements of the statutory exemption in ERISA § 408(e), 29 *U.S.C.* § 1108(e), including the requirement that the transaction be for adequate consideration.   In granting PTE 99-31, the DOL expressed no opinion as to whether the stock sale would comply with those requirements.

The exemption required an "independent, qualified fiduciary" to "approve" those transactions covered by the exemption.  In approving the transactions, the independent fiduciary had to comply with "the general fiduciary responsibility provisions of [ERISA § 404], which among other things require a fiduciary to discharge his duty solely in the interest of the participants and beneficiaries of the plan and in a prudent fashion in accordance with [ERISA] § 404(a)(1)(B)."  The exemption's availability was also subject to an expressed condition that the material facts and representations contained in the application accurately described all material terms of the transaction.

Clearly, the stock sale, assignment and loan were prohibited by ERISA §§ 406 and 408, in the absence of an exemption.  Unaka, Henderson and STRINCO, as parties claiming the benefit of the administrative exemption contained in PTE 99-31, have the burden of proving that the exemption applies.  *Fair Hous. Advocates Ass'n, Inc. v. City of Richmond Heights,* 209 F. 3d 626 (6th Cir. 2000); *Herman v. Palo Group Foster Home, Inc.*, 183 F. 3d 468 (6th Cir. 1999).  Therefore, to avoid liability, Henderson, STRINCO and Unaka must prove that they satisfied two exemptions:

> (1)  A statutory exemption, ERISA § 408(e), 29 *U.S.C.* § 1108(e), which required Unaka to pay "adequate

consideration" for the Plan's Unaka stock; and

(2) An administrative exemption issued by the Department of Labor, PTE 99-31, which, among other things, required that the loan be "equal to the difference between $413.00 and the fair market value per share for the common stock of Unaka held by the Plan.

ERISA § 406(a), 29 *U.S.C.* § 1106(a), prohibits certain transactions between an ERISA plan and a related party ("party in interest") unless those transactions qualify for an exemption under 29 *U.S.C.* § 1108. The Plan's sale of its Unaka stock to Unaka, the assignment of the Plan's fiduciary breach claims to Unaka and the loan from Unaka to the Plan are all prohibited transactions because Unaka is a party in interest to the Plan under ERISA § 3(14), 29 *U. S. C.* § 1002(14). A transaction can be exempt if it meets the requirements of a statutory exemption under § § 408(b)-(f), 29 *U.S.C.* § § 1108(b)-(f) or if it meets the conditions of an administrative exemption granted by the Secretary of Labor under § 408(a), 29 U.S.C. § 1108(a), that specifically covers the transaction. The assignment and loan agreement in this case are exempt transactions if they meet the conditions of the administrative prohibited transaction exemption granted by the Secretary on July 27,

1999 (PTE 99-31, 64 Fed. Reg. 40, 627).[66]    PTE 99-31 specifically listed the

transactions subject to the exemption:

(1)    The assignment of the Plan's fiduciary claims to Unaka,

(2)    The interest free, non-recourse loan from Unaka to the Plan;

(3)    The possible repayment of the loan from any recovery on the fiduciary

    breach claims;

(4)    The extension of credit by Unaka to the Plan of certain litigation expenses

    related to the fiduciary breach claims; and

(5)    The possible reimbursement of Unaka for those expenses from any

    recovery of the fiduciary breach claims.

PTE 99-31 does not provide relief for the sale to Unaka of the Plan's

Unaka stock.  To be exempt, the sale of the stock must comply with ERISA § 408(e),

29 *U.S.C.* § 1108(e), which exempts the sale to Unaka if the sale was for "adequate

consideration."   Adequate consideration is the "fair market value of the asset as

determined in good faith by the trustee."   29 *U.S.C.* § 1002(18)(B).  The parties who

engage in the transaction have the burden of proving that the transaction is exempt

under § 408, that is, that it meets the condition of either a statutory or administrative

exemption.  *Howard*, 100 F. 3d at 1488 (9th Cir. 1996).   Any person claiming the §

---

[66]   PTE  99-31 is a conditional exemption and granted relief for the loan and assignment if (14) separate
conditions are satisfied.  64 Fed. Reg. at 40627.

408(e) exemption must establish: (1) that the price paid for the stock reflects its fair market value and (2) that the fiduciary conducted a good faith determination to establish the value. *Chao,* 285 F. 3d at 436 (6th Cir. 2002). The standard for determining fair market value is set forth in DOL's *"Proposed Regulation Relating to the Definition of Adequate Consideration"*, 53 Fed. Reg. 17, 632[67] as:

> " . . . the price at which an asset would change hands
>
> between a willing buyer and a willing seller when the former
>
> is not under any compulsion to buy and the latter is not under
>
> any compulsion to sale, and both parties are able, as well as
>
> willing, to trade and are well informed about the asset and
>
> the market for such asset."

To avoid liability for these prohibited transactions, Unaka, Henderson and STRINCO have the burden of proving that each of the stock sale, the assignment and the loan were covered by an exemption. Newman and Jaynes generally allege the following:

(1)     The July 13, 2000 sale of the Plan's Unaka stock was for less than

---

[67] 29 *U.S.C.* § 1002(18)(B) defines adequate consideration for an asset like the Plan's Unaka stock for which there is no generally recognized market as "the fair market value of the asset as determined in good faith by the trustee . . . in accordance with regulations promulgated by the Secretary" of Labor. The DOL proposed regulation was issued in 1988 but never adopted. It nevertheless serves as the standard for determining adequate consideration.

Case 2:99-cv-00267   Document 341   Filed 04/26/05   Page 72 of 87   PageID #: 749

"adequate consideration" within the meaning of ERISA § 3(18)(B), 29

U.S.C. § 1002(18)(B).   More specifically, Newman and Jaynes argue that

the $13.00 per share price paid by Unaka did not reflect the fair market

value of the stock and that Henderson and STRINCO failed to make a

good faith determination that the fair market value of the Plan's stock was

no more than $13.00 per share as of July 13, 2000; and

(2)     Because the stock sale did not comply with ERISA § 408(e), Unaka,

Henderson and STRINCO made a material misrepresentation in its

application for PTE 99-31 and PTE 99-31 is, therefore, ineffective to

relieve Unaka, Henderson and STRINCO from liability for engaging in

the loan and assignment transactions.

### *The sale of the Plan's Unaka stock and adequate consideration*

To satisfy the "adequate consideration" requirement of § 408(e),

Henderson, STRINCO and Unaka  must demonstrate that the $182,000.00 (or $13.00

per share) that Unaka paid for the Plan's Unaka stock reflected the stock's fair market

value and that STRINCO and Henderson made a good faith determination that the

stock's fair market value did not exceed that amount.   While often stated as two

distinct parts of the adequate consideration requirement, the *Proposed Regulation*

"links the fair market value and good faith requirements to assure that the resulting

valuation reflects market considerations and is the product of a valuation process conducted in good faith." Therefore, the Court's evaluation of fair market value and its evaluation of the trustee's good faith in the determination of fair market value are clearly intertwined. The inquiry related to the trustee's good faith focuses primarily on the conduct of the trustee, taking into account all relevant facts and circumstances. In fact, Congress intended to allow a fiduciary a limited degree of latitude so long as that fiduciary acted in good faith. Thus, the inquiry into the trustee's good faith is highly fact dependent, requiring the Court to examine the relevant facts and circumstances. See generally *Proposed Regulation*, 53 Fed. Reg. at 17634-35.

### *Fair Market Value*

The first part of the two part test for adequate consideration requires a determination of the Plan's Unaka stock's fair market value. The term "fair market value" for ERISA purposes is "the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are ***well informed about the asset and the market for that asset.***" (emphasis added) Fair market value of an asset will ordinarily be identified by a range of valuations rather than a specific, set figure; therefore, the valuation assigned to an asset must reflect a figure within an acceptable range of valuations for

Case 2:99-cv-00267   Document 341   Filed 04/26/05   Page 74 of 87   PageID #: 751

that asset.  Fair market value must be determined as of the date of the transaction involving the asset.  *Id.* at 17634

A review of the facts and circumstances involved in the sale of the Plan's stock in this instance reveals that after Henderson was engaged in July of 1998 to act as a successor trustee of the Plan and STRINCO was appointed to act as the Plan's investment manager, Henderson and STRINCO made a thorough, diligent and, ultimately, very successful review of the Plan's holdings.   This was a lengthy process that ultimately led Henderson and STRINCO, with the help of  independent financial and legal advisors, to conclude that the fair market value of the Plan's Unaka stock was $13.00 per share.   This Court also concludes that Henderson is a highly competent, well qualified independent fiduciary who is "very good at what he does."[68]

STRINCO also hired an independent valuation advisor relative to the July, 2000 transaction with Unaka.   Newman and Jaynes do not reasonably contest that Willamette is a qualified independent valuation advisor, nor could they do so. Willamette specializes in business valuation and Willamette's report was prepared by Robert S. Socol, director of Willamette's employees benefit practice.   Socol is a well qualified valuation expert who has been in the business for more than 20 years and has done "many hundreds if not thousands" of valuations.   Willamette was engaged by

---

[68]  This is the description given by Newman and Jaynes' retained expert witness, Jared Kaplin.

Case 2:99-cv-00267   Document 341   Filed 04/26/05   Page 75 of 87   PageID #: 752

STRINCO to provide independent financial and valuation advice and to evaluate the composite transaction for overall fairness to the Plan. Although Newman and Jaynes argue that Willamette's engagement agreement did not state that Willamette would provide an opinion as to the fair market value of the Plan's stock, Socol testified that such a determination was necessary in order to provide a fairness opinion. Henderson also hired and consulted qualified legal counsel to advise him with respect to the July, 2000 transactions and, again, Newman and Jaynes do not question the qualifications of the legal counsel chosen by Henderson.

Determination of the fair market value of the Plan's stock required the expert opinion of a qualified independent valuation expert, as Newman and Jaynes concede. Indeed, pursuant to the proposed DOL regulation, "the extent to which the department will view a valuation as reflecting fair market value will be affected by an assessment of the level of expertise demonstrated by the parties making the valuation." *Id.* at 17634. Indeed, "a court reviewing the adequacy of consideration under § 3(18) is to ask if the price paid is "the fair market value of the asset as determined in good faith by the . . . fiduciary; it is not to redetermine the appropriate amount for itself *de novo.*" *Chao*, 285 F. 3d at 437.[69]

---

[69] This Court is very mindful that Senior U.S. District Judge Thomas Gray Hull, to whom this case was previously assigned, granted summary judgment against Unaka, Henderson and STRINCO on these claims. That summary judgment order was subsequently vacated by this Court. Judge Hull, noting the "many available evaluations of record" of the Unaka stock and considering that the Plan stock represented a 26% stake in a

In its analysis, Willamette concluded that the valuation for the Plan's

stock ranged between $5.00 and $300.00 per share.   This range included the

aggressive statement of the high end of the range based on instructions from

Henderson and his counsel to use optimistic assumptions to achieve the highest

upward end for the range.  While Newman and Jaynes now complain about

Willamette's resulting range, such a range is entirely consistent with the DOL

*Proposed Regulation* § 2510.3–18(b), which Newman and Jaynes acknowledge has

become the accepted industry standard for determining whether a purchase or sale of

employer's securities is for an adequate consideration within the meaning of ERISA.

Willamette applied a 40% discount for lack of marketability to reach the

upper end of its evaluation range; however, Socol testified that, except for contrary

instructions from Henderson and Henderson's counsel, they would likely have applied

a much more significant discount to the upper end of the range.   He further testified

---

company valued by Willamette in excess of $18 million, held that the fair market value of the stock "would have
necessarily been considerably higher" than $13 per share.  It appears to this Court that Judge Hull, for whom this
Court has the greatest respect, made a *de novo* determination of fair market value rather than  a determination of
whether a factual dispute existed about whether a good faith determination of the fair market value of the Plan's
Unaka shares had been made by the trustee.  The fact that multiple valuations have been undertaken without an
examination of the purpose of the evaluation is basically meaningless.  As pointed out in the *Proposed Regulation,*
"A valuation undertaken, for example, for a yearly financial report may prove an inadequate basis for any sale
of the asset in question."  *Proposed Regulation,* 53 Fed. Reg. at 17635.  An evaluation of a trustee's determination
of adequate consideration necessarily focuses on the process used by the trustee to determine fair market value,
a fact intensive  evaluation by definition.  To conclude that the Plan received adequate consideration for its Unaka
stock, this Court need not agree that $13.00 per share is in fact fair market value of the stock but rather that
Henderson and STRINCO arrived at the price by way of a prudent investigation in the circumstances then
prevailing.  The focus, then, of the Court's inquiry  is upon the conduct of the fiduciaries.

that a marketability discount of up to 95% on closely held stocks such as the Unaka

stock has been applied in similar situations. In short, Newman and Jaynes have

offered absolutely no evidence that Willamette's valuation did not comply with all the

applicable requirements of the *Proposed Regulation*. The price offered by Unaka

($13.00 per share) and accepted by Henderson falls within the range of valuation

provided by Willamette.[70] Although Newman and Jaynes complain that Socol was

never asked to determine a price point within the $5.00 to $300.00 per share range that

would best reflect the stock's fair market value, they cite, and indeed there is, no

---

[70] The Court has carefully considered the testimony of the expert offered by Newman and Jaynes. Robert Bruce Den Uyl is also a qualified valuation expert who valued the Unaka stock at $341.00 per share on a non-marketable basis. The Court finds Willamette's valuation methodology and conclusions more credible than those of Den Uyl for several reasons. Among those reasons are that Den Uyl's opinion of the value of the stock provides a specific valuation point, rather than a range of valuations. This appears to be contrary to the standard as well as the proposed DOL regulation. In addition, Den Uyl considered only two methodologies in arriving at his opinions. He used the discounted cash flow method and the guideline publicly traded company method. Willamette, on the other hand, used two market approaches and one income approach. In addition to the methods used by Den Uyl, Willamette also considered the market offer method which the Court finds to be a fundamentally sound method to be considered along with other methods. As Socol testified, to fail to consider the market offer method "defies common sense and what actually goes on in the marketplace." The *Proposed Regulation* also directs that actual market considerations be taken into account in doing a valuation. In point of fact, it does not appear that Den Uyl considered market considerations at all in arriving at his valuation, something the Court considers to be a fundamental flaw in his valuation process. He does not appear to have considered that the Unaka situation was a "highly unique situation" with a company controlled by a single shareholder in a highly litigious situation, that the stock was essentially illiquid with no basis for marketability and that the company was run for the benefit of a single control shareholder. It is simply not appropriate, as Den Uyl seems to conclude, not to consider all of the facts and circumstances concerning the specific asset in question, "including any specific circumstances which may affect the value of the asset . . ." *Proposed Regulation*, 53 Fed. Reg. 17364. In fact, the *Proposed Regulation* provides that "a valuation determination which fails to reflect . . . market forces . . .would also fail to meet the requirements of Section 3(18) of the Act . . ." *Id.* at 17633. The *Proposed Regulation* directs a fiduciary with "specific knowledge, concerning either the particular asset or the market for that asset" to take that knowledge into account in negotiating the price for the asset "in order to meet the fair market value standard of" the regulation. *Id.* at 17634. "Nothing in the [*Proposed Regulation*] should be construed as justifying a fiduciary's failure to take into account all relevant facts and circumstances in determining adequate consideration." (emphasis added) *Id.* at 17633.

authority for such a proposition.[71]

Newman and Jaynes also allege that the fair market value determination by Henderson and STRINCO violated the *Proposed Regulation's* requirement that the fair market value of an asset be reflected in a "written documentation of valuation" and that the written report did not set forth the weight given by Willamette with respect to each of the methodologies used. With respect to Newman and Jaynes' assertion that Willamette's report did not express an opinion that "the fair market value of the stock is not greater than $13.00 per share", it is simply incorrect. Socol unequivocally testified that the report provided to Henderson indicated that $13.00 per share was the fair market value of the stock and he also testified that the July 13 and July 14, 2000 letters from Willamette which stated that the fair market value of the stock did not exceed the purchase price referred to the $13.00 per share price. In any event, the written documentation required by the *Proposed Regulation* "need not be a written report of an independent appraiser. Rather, it should be documentation sufficient to allow the department [or in this case the Court] to determine whether the

---

[71] The Court notes that the position of Newman and Jaynes seems to be that all aspects of a transaction must be considered in a vacuum or "hypothetically" without regard to the market forces, including specific circumstances which may affect the value of the asset. The Court simply notes that such a position is not supported by the case law nor is it supported by the proposed DOL regulation and blind adherence to the standard advanced by Newman and Jaynes would, in a case like this, require the Plan to hold a highly illiquid, non-income producing stock with no market in perpetuity and to the clear disadvantage of employees whose retirement depends upon liquid assets in the fund with which to pay their retirement benefits. It is inconceivable that even hypothetical parties would not be aware of the market forces, especially that the Plan had been trying to sell the stock for over a year and that no one had offered more than $13.00 per share for the stock.

content requirements of § 2510.3–18(B)(4) had been satisfied." *Id.* at 17634. Clearly,

the documentation relative to the valuation, taken as a whole, establishes sufficient

written documentation of fair market value by Willamette. Not only that, this Court

had the benefit of Socol's testimony and it would be silly to ignore it.

Newman and Jaynes are also correct that the *Proposed Regulation*

requires a statement as to the relative weight accorded to relevant valuation

methodologies. The regulation does not, however, require a statement such as that

used by Den Uyl, the counter-plaintiffs' expert, which indicates that he weighted the

discounted cash flow method at two-thirds (2/3) and the guideline publicly traded

company method at one-third (1/3). Such a statement, in and of itself, is meaningless.

What the regulation simply requires is that the appraiser explain the methodologies

used in such a fashion that the department, or the Court, can intelligently evaluate the

appraiser's approach to his valuation. The Willamette documentation does that. Even

if Newman and Jaynes are correct that the Willamette report is technically deficient,

they cite no authority to this Court for the proposition that a failure to set these matters

out in a report in the manner which they propose constitutes a violation of § 408(b) or

the Proposed Regulation,[72] or that such deficiencies entitle them to a finding by this

_____

[72] While the Court notes that the commentary to the *Proposed Regulation* does speak in terms of "a statement as to the relative weight accorded to relevant valuation methodologies", the content of the regulation itself at § (b)(4)(i)(F) simply indicates that the report contain a statement of "the relevance or significance accorded to the valuation methodologies taken into account."

Court that the transactions are, therefore, prohibited.

### *Good Faith*

The second part of the two part test requires an assessment of fair market value to be the product of a determination made in good faith by the Plan trustee. This good faith requirement establishes an objective standard of conduct, rather than mandating an inquiry into the intent or state of mind of the Plan trustee. The inquiry focuses on the fiduciary's conduct in determining fair market value. The *Proposed Regulation* focuses on two factors which must be present in order for the department [or in this case,the Court] to be satisfied that the fiduciary has acted in good faith. First of all, the fiduciary must "apply sound business principles of evaluation and to conduct a prudent investigation of the circumstances prevailing at the time of the valuation." *Id.* at 17634. As set forth above, Henderson and STRINCO conducted a diligent and thorough evaluation of the transaction and acted prudently and in full compliance with their fiduciary duties by consummating the July 13, 2000 transaction.

Not only were Henderson and STRINCO extremely well qualified for their duties and diligent in carrying them out, they engaged independent valuation advisers and legal counsel to assist in their review of this transaction. And, "although securing an independent assessment from a financial adviser or legal counsel is

evidence of thorough investigation, it is not a complete defense to a charge of imprudence" unless three requirements are met. A fiduciary must (1) investigate the expert's qualifications, (2) provide the expert with complete and accurate information, and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances. *Chao*, 285 F. 3d at 430. This Court specifically finds that all of the requirements justifying Henderson and STRINCO's reliance on Willamette and their chosen legal counsel have been met and such reliance is a defense to any charge of imprudence in this case. There appears to be little question but that Henderson and STRINCO used prudent business practices in valuing the Plan's stock.

Secondly, the *Proposed Regulation* requires "that either the fiduciary making the valuation must itself be independent of all the parties to the transaction . . . or the fiduciary must rely on the report of an appraiser who is independent of all of the parties to the transaction." *Proposed Regulation*, 53 Fed. Reg. at 17634. There is no evidence to suggest that Willamette was anything other than independent of all the parties to this transaction and Newman and Jaynes do not seriously suggest otherwise.

As a result of the composite transaction entered into with Unaka, the Plan received a total of $5,782,000.00 on July 14, 2000, an amount equivalent to $413.00 per share for the Plan's shares. The July 13, 2000 transaction served the benefit and

best interest of the Plan, its participants[73] and its beneficiaries. Henderson and STRINCO acted prudently and in full compliance with their fiduciary duties by consummating the July 13, 2000 transaction. Had Henderson not accepted Unaka's offer and instead refused to close on the composite transaction, the Plan would have been left to hold stock for which there was no reasonable market and no other avenue available for realizing an equivalent amount of cash for the Plan.[74]

This Court specifically finds that Henderson and STRINCO conducted a prudent investigation of the circumstances then prevailing and acted in reliance upon qualified independent valuation and legal opinions before reaching the conclusion that the fair market value of the Plan's Unaka stock was not greater than $13.00 per share.[75] While the record establishes that the counter-plaintiffs' expert is a qualified valuation expert, the wide range of differences between the Willamette valuation and the Den Uyl valuation illustrates that valuation is not a science and that reasonable

---

[73] In fact, both Newman and Jaynes benefitted personally from the July 13, 2000 transaction. Jaynes cashed out his entire remaining interest in the Plan in July, 2002 and Newman cashed out the majority of his interest in the Plan as well, all of which was done while the Plan's Unaka stock was valued at $413.00 per share or higher.

[74] Newman and Jaynes argue that the Plan should have held its stock until the merger of Unaka and Rolich in June, 2001, which would have entitled it to receive "fair value" for its shares. This ignores the clear and unequivocal testimony of Austin, Jr. that there would have been no merger of Rolich and Unaka had the Plan still owned its Unaka shares at that time, and requires the Court to speculate about whether the merger would have occurred or not.

[75] The Court is quite aware that the expert retained by Newman and Jaynes for the purposes of this litigation valued the Plan's Unaka shares at $341.00 per share as of July 13, 2000.

experts can, and often do, disagree about the value of a particular asset, such as the

Plan's shares.  One deficiency in Den Uyl's valuation, discussed in greater detail in

footnote 70,  however, appears to be a lack of consideration of the market forces at

work in July, 2000.  While the counter-plaintiffs argue that consideration of the actual

offers received by Henderson of $5.00 per share and $13.00 per share as the result of

his solicitation of bids should not be considered, the proposed DOL regulation clearly

indicates otherwise.[76]  Counter-plaintiffs also rely blindly upon an argument that the

Plan could have received fair value for its shares at the time of the Rolich – Unaka

merger, a merger which never would have occurred had the Plan continued to own its

shares.

### _Material Misrepresentations in the PTE application_

The availability of  PTE 99-31 was subject to the express condition that

"the material facts and representations contained in each application accurately

describes all material terms of the transaction which is the subject of the exemption."[77]

During the PTE process, DOL specifically asked that the applicants add a provision

expressly stating that the proposed sale by the Plan to Unaka of the Plan's Unaka stock

---

[76]  At the very least, market offers are an indication of the marketability, or lack thereof, of the assets.

[77]  29 _C.F.R._ § 2570.49 also provides:  "(a)  An exemption does not take effect or protect parties in interest from liability with respect to the exemption transaction unless the material facts and representations contained in the application and in any materials and documents submitted in support of the application were true and complete.

would satisfy § 408(c) of ERISA. Newman and Jaynes argue that the stock sale did not comply with the adequate consideration requirement of § 408(e) and that the representation otherwise was a material misrepresentation which renders PTE 99-31 ineffective to relieve Unaka, STRINCO and Henderson from liability for engaging in the loan and assignment transactions.

Given this Court's finding that the stock sale was for adequate consideration, this claim by counter-plaintiffs is MOOT. Even if it were not moot, however, the claim is without merit. It is not clear to the Court why DOL insisted on this representation since the administrative exemption did apply to the stock sale in the first place and the stock sale had to comply with § 408(e). With or without the representation it can hardly be argued, therefore, that the language induced DOL to grant the exemption and it is simply not a material misrepresentation.

The Court, therefore, **FINDS** that neither Henderson nor STRINCO breached any fiduciary duty to the Plan, its participants or beneficiaries. More specifically, the Court **FINDS** that Unaka, Henderson and STRINCO complied fully with ERISA § 406(a) and PTE 99-31 when they entered into the stock sale, assignment and loan transaction. The counter-complaint and third party complaint will be dismissed.[78]

---

[78] Even were this Court to find that Henderson, STRINCO and Unaka had violated their fiduciary duties relative to the January, 2000 transaction, the Plan suffered no damage as a result thereof. The Plan received the

***Attorney's fees***

ERISA § 502(g)(1), 29 *U.S.C.* § 1132(g)(1) authorizes the court, in its discretion, to allow a reasonable attorney's fee and costs to either party. The exercise of the Court's broad discretion in deciding whether to award attorney's fees under ERISA requires the Court to consider and weigh a number of different factors. *Schwartz v. Gregori*, 16 F. 3d 1116, 1119 (6th Cir. 1998). No single factor is determinative, and the Court must consider each factor before exercising its discretion. *Id.* This Court's review of the applicable factors leads to the conclusion that no one factor or combination of factors weighs heavily in favor of an award of attorney's fees to any party. Therefore, in the exercise of its discretion, the Court **FINDS** that no party is entitled to an award of attorney's fees, and the prayer of the various parties for

---

equivalent of $413.00 per share for its Unaka stock, an amount in excess of either parties' calculation of fair market value of the Plan's stock at the time. This Court would not, and indeed could not, award "rescissory" damages measured by the difference between the aggregate $413.00 per share value the Plan actually received and the hypothetical "fair value" it would have received if it had retained its Unaka stock and exercised dissenters' rights in the merger. To find that a merger would have occurred had the Plan continued to hold its Unaka shares would require this Court to speculate and would, in fact, be contrary to any evidence offered at trial. Counsel for Newman and Jaynes conceded during the trial that such evidence was speculative but argued that it went only to the weight of the evidence. Newman and Jaynes also suggest that "in addition to any award of damages to the Plan on the stock sale, the Plan is entitled to equitable relief" consisting of reformation of the note payable by the Plan to the extent that the note purports to entitle Unaka to repayment of any amount exceeding $1,008,000.00. In view of the Court's holding on the fiduciary claims against Newman and Jaynes, and the Court's holding that Unaka lacks standing, such relief would not be available. Newman and Jaynes' suggestion of an alternative to the rescissory damages proposed by them would also not be available given this Court's finding that $13.00 per share was within the range of fair market value for the stock.

an award of attorney's fees will be denied.

An appropriate order will enter.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE